EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dionisia Flecha Quiñones<br><br>Recurrida<br><br>vs.<br><br>Carmen Elizabeth Lebrón Morges; José Ángel Rey y otro<br><br>Peticionarios | Certiorari<br><br>2005 TSPR 176<br><br>166 DPR _____ |

Número del Caso: CC-2003-488

Fecha: 23 de noviembre de 2005

Tribunal de Apelaciones:

                Circuito Regional I de San Juan-Panel I

Panel integrado por su presidenta, la Jueza Fiol Matta, y los Jueces González Rivera y Rivera Martínez


Abogados de la Parte Peticionaria:

                Lcdo. Fernando E. Agrait
                Lcdo. José Ángel Rey

Abogado de la Parte Recurrida:

                Lcdo. Lucas M. Irisarri Castro


Materia:  Impugnación de Cartas Testamentarias, Nulidad de Contrato y Daños y Perjuicios.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Dionisia Flecha Quiñones

    Recurrida

       vs.                    CC-2003-488    CERTIORARI

Carmen Elizabeth Lebrón;
José Ángel Rey y otros

    Peticionarios


SENTENCIA

San Juan, Puerto Rico, a 23 de noviembre de 2005


La heredera recurrida, Dionisia Flecha Quiñones, radicó ante la Sala Superior de San Juan del Tribunal de Primera Instancia una demanda contra la albacea peticionaria, Carmen Elizabeth Lebrón Morges; contra el abogado de la Sucesión de Josefina Orraca López, Lcdo. José Ángel Rey; y contra el Banco Popular de Puerto Rico. En la referida demanda, Flecha Quiñones cuestionó: la corrección de unas actuaciones realizadas por la albacea Lebrón Morges; la validez del contrato de servicios profesionales que ésta había otorgado con el Lcdo. Rey; y las actuaciones del Banco Popular, respecto al

desembolso de fondos pertenecientes al caudal de la Sucesión Orraca López.

La demandante Flecha Quiñones solicitó del tribunal que le ordenara a la albacea reembolsar las sumas de dinero que había retirado de los fondos depositados en el Banco Popular; que le ordenara al Lcdo. Rey abstenerse de desempeñar gestión profesional alguna a nombre de la heredera-demandante; y que le ordenara a la albacea abstenerse de realizar tareas de partición, representación o administración sobre los bienes de la herencia, que no fuera velar por el cumplimiento de la voluntad de la causante. Asimismo, solicitó que se condenara a los demandados a indemnizarla por los daños y perjuicios sufridos como consecuencia de sus actuaciones negligentes e ilegales.

Luego de que los demandados Lebrón Morges y el Lcdo. Rey presentaran una solicitud de sentencia sumaria --en la cual sostuvieron la legalidad de todas las actuaciones impugnadas-- la demandante Flecha Quiñones solicitó del tribunal la descalificación del Lcdo. Rey, como abogado de la albacea, por razón de un alegado conflicto de intereses.

El foro de instancia mediante resolución a esos efectos resolvió, en síntesis, que: las funciones del albacea eran unas limitadas, enfatizando la necesidad del consentimiento de la heredera para la realización de las mismas; el contrato de servicios profesionales, otorgado

entre la albacea Lebrón Morges y el Lcdo. Rey era nulo; y que procedía decretar la descalificación del Lcdo. Rey como abogado de la Sucesión Orraca López.

Insatisfechos, los demandados acudieron ante el Tribunal de Apelaciones. Dicho foro <u>confirmó</u> al tribunal de instancia en todas sus determinaciones. Inconforme, Lebrón Morges acudió ante este Tribunal --vía *certiorari*-- en revisión de la actuación del foro apelativo intermedio, imputándole a dicho foro haber errado al:

> ...confirmar la decisión del [Tribunal] de Primera Instancia, conviniendo con éste en que, como cuestión de derecho, un albacea en nuestra jurisdicción no tiene facultades de administración de la herencia si el testador no se las ha señalado expresamente.

> ...confirmar la decisión del [Tribunal] de Primera Instancia conviniendo en que éste actuó correctamente al resolver, como cuestión de hecho, sumariamente y sin haber celebrado un juicio plenario, que la testadora no le confirió facultades de administración de la herencia a la albacea peticionaria, y que los honorarios convenidos por la albacea y su abogado son "excesivos".

> ...confirmar la decisión del [Tribunal] de Primera Instancia de descalificar al abogado peticionario sumariamente, negándole su derecho a ser oído y presentar prueba respecto a la solicitud de descalificación, en violación del debido procedimiento de ley y la doctrina judicial vigente, tanta veces reiterada por este Tribunal.

I

Un examen detenido de los hechos del presente caso, de la ley aplicable y de la jurisprudencia interpretativa de la misma, nos convence de que procede decretar la

revocación de la resolución emitida en el presente caso por el Tribunal de Apelaciones y devolver el caso al Tribunal de Primera Instancia para la continuación de los procedimientos. Resolvemos que, conforme los hechos del presente caso y la ley y la jurisprudencia aplicable a los mismos, la albacea Lebrón Morges es, para todos los efectos legales, la administradora judicial de los bienes de la herencia de Orraca López. En virtud de ello, la referida albacea, como administradora judicial, podía posesionarse de los bienes de la causante y ejercer sobre éstos todas las facultades que le concede la ley.

Por otro lado, somos del criterio que erraron, tanto el foro de instancia como el foro apelativo intermedio, al resolver que el contrato suscrito por la albacea Lebrón Morges y el Lcdo. Rey era nulo porque los honorarios pactados eran excesivos. Cuando la albacea someta al tribunal las cuentas, con todos los detalles de su gestión, es que el foro de instancia estará en posición de evaluar la validez de los honorarios pactados entre la albacea y el Lcdo. Rey, ello luego de celebrar una vista para que, conforme a la prueba presentada, pueda tomar una determinación sobre la procedencia de dicho gasto.

Finalmente, y en cuanto a la descalificación _sumaria_ del Lcdo. José Ángel Rey como abogado de la Sucesión Orraca López, lo que procede es que el foro de instancia celebre una vista para permitirle al referido abogado defender su posición y darle la oportunidad de tratar de

demostrar que no existe conflicto de interés alguno en la representación legal de la albacea. De esta manera, el foro de instancia determinará, luego de sopesar los criterios antes mencionados, si procede o no la descalificación del Lcdo. Rey[1].

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina. El Juez Asociado señor Rebollo López emitió Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión de Conformidad, Concurrente y Disidente. El Juez Presidente señor Hernández Denton emitió Opinión Disidente. La Juez Asociada señora Fiol Matta inhibida.


                           Dimarie Alicea Lozada
                  Secretaria del Tribunal Supremo Interina

---

[1] De igual forma, queremos dejar claro que no estamos pasando juicio sobre si en este caso existe un conflicto de interés del Lcdo. Rey. Esa determinación le compete al Tribunal de Primera Instancia, luego de celebrada la vista.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Dionisia Flecha Quiñones

    Recurrida

       vs.                         CC-2003-488
                  CERTIORARI

Carmen Elizabeth Lebrón;
José Angel Rey y otros

    Peticionarios

OPINIÓN DE CONFORMIDAD EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LOPEZ

San Juan, Puerto Rico, a 23 de noviembre de 2005

La Lcda. Josefina Orraca López falleció en San Juan, Puerto Rico, el 2 de marzo de 2000, sin dejar descendientes ni ascendientes, habiendo otorgado testamento ológrafo el 21 de mayo de 1999.

Mediante el referido testamento, Orraca López instituyó heredera a la Sra. Dionisia Flecha Quiñones e hizo ciertos legados a favor de la Sra. Carmen Elizabeth Lebrón Morges; designó, además, a Lebrón Morges como albacea "con todas las potestades que concede la ley y por todo el tiempo que resultare necesario para los trámites legales correspondientes, relevándola expresamente de la prestación de fianza." Resulta

procedente señalar que Orraca López <u>no</u> dispuso sobre la <u>administración</u> de sus bienes.

Luego de que Lebrón Morges presentara la correspondiente solicitud de protocolización de testamento, el 9 de mayo de 1999, el Tribunal de Primera Instancia, Sala Superior de San Juan, emitió una resolución ordenando que se protocolizara el testamento ológrafo otorgado por Orraca López[2]. Conforme a dicha orden, el testamento ológrafo fue protocolizado el 6 de junio de 2000 mediante la escritura número 11 otorgada ante el notario, Lcdo. José Ángel Rey.

Por su parte, Lebrón Morges otorgó, el 11 de mayo de 2000, un contrato de servicios profesionales con el Lcdo. Rey[3], mediante el cual este último se obligó a prestar a la albacea todos los servicios legales necesarios para que ésta pudiera desempeñar las funciones de su cargo. Asimismo, se obligó a prestar todos los servicios que fueran necesarios para traer al caudal hereditario de

---

[2] El 2 de mayo de 2000 se celebró la vista para la práctica de las diligencias correspondientes a la protocolización del testamento ológrafo. <u>A dicha vista compareció Lebrón Morges representada por su abogado, Lcdo. José Angel Rey</u>; la Sra. Flecha Quiñones, en su carácter de heredera, representada por su abogado, Lcdo. Lucas Irrissari Castro; la Sra. Angelina Orraca López, hermana de la testadora, representada por su abogada, Lcda. Iris Torres Orraca; Josefa Orraca López, hermana de la testadora, representada por sus hijos Víctor y Lourdes Porto Orraca; Armando y Orlando Orraca Yon, sobrinos de la testadora.

[3] El Lcdo. Rey era el abogado de la causante, Orraca López, y de la madre de ésta, la señora Francisca López Viuda de Orraca, que falleció en febrero de 1999.

Orraca López los bienes que ella había heredado de su madre, la Sra. Francisca López Viuda de Orraca.

De conformidad con el contrato, el Lcdo. Rey recibiría honorarios equivalentes al 15% del valor del caudal hereditario de la causante Orraca López. Además, se acordó que, en caso de que el testamento fuera impugnado, o si se promoviera alguna acción judicial relacionada con las facultades del albacea o desempeño de su cargo, el Lcdo. Rey cobraría honorarios equivalentes a $150 por hora por sus servicios como abogado. El referido contrato fue suscrito sin el conocimiento ni intervención de la heredera, Sra. Flecha Quiñones.

Así las cosas, el 6 de junio de 2000, Lebrón Morges presentó una petición al Tribunal de Primera Instancia, Sala Superior de San Juan, solicitando que, conforme a las disposiciones del Código de Enjuiciamiento Civil, se le expidiera a su favor Cartas Testamentarias donde se acreditara su autoridad como albacea con todas las facultades que le concede la ley. A esos efectos, el 8 de junio de 2000, dicho tribunal expidió cartas testamentarias a favor de Lebrón Morges "facultándola [para] que en cuanto no sea incompatible con la ley o con la última voluntad del testador, tome posesión de todos los bienes de la finada, desempeñando, respecto a los mismos todos los poderes, facultades y obligaciones que le señalan la ley, y fueron encomendados por la testadora."

Conforme a dicha "autorización", el 9 de junio de 2000, la albacea Lebrón Morges tomó posesión de todos los fondos que la testadora tenía depositados en el Banco Popular de Puerto Rico, los cuales fueron utilizados para saldar las obligaciones de la causante con dicha institución bancaria y poner al día los pagos vencidos que correspondía pagar. El sobrante fue transferido a una cuenta corriente que la albacea abrió en dicho banco a nombre de la sucesión de Orraca López.

La heredera Flecha Quiñones nunca fue consultada sobre dichas gestiones. Sin embargo, el abogado de la albacea, el Lcdo. Rey le notificó por medio de una carta, el 12 de junio de 2000, al Lcdo. Lucas M. Irisarri Castro, representante legal de la heredera Flecha Quiñones, las gestiones realizadas en cuanto a los fondos de la causante depositados en el Banco Popular.

El 12 de junio de 2000, la heredera Flecha Quiñones presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda contra la albacea y legataria, Sra. Carmen Lebrón Morges, el Lcdo. José Angel Rey y el Banco Popular de Puerto Rico. Alegó, en síntesis, que las cartas testamentarias otorgadas a favor de la albacea eran nulas, en cuanto facultaban a la albacea para tomar posesión de todos los bienes de la causante toda vez que ésta no tenía facultades de administración.

De igual forma, alegó que el contrato de servicios profesionales, suscrito entre el Lcdo. Rey y la albacea

Lebrón Morges, era nulo toda vez que la heredera no había prestado el consentimiento para el mismo y además los honorarios pactados eran excesivos. En cuanto al Banco Popular de Puerto Rico, alegó que éste había sido negligente al autorizar el desembolso de los fondos de la causante a la albacea, sin ésta tener autoridad para ello.

La demandante solicitó como remedio: que el tribunal le ordenara a la albacea reembolsar las sumas de dinero que había retirado de los fondos depositados en el Banco Popular; que le ordenara al Lcdo. Rey abstenerse de desempeñar gestión profesional alguna a nombre de la heredera-demandante; y que le ordenara a la albacea abstenerse de realizar tareas de partición, representación o administración sobre los bienes de la herencia, que no fuera velar por el cumplimiento de la voluntad de la causante. Asimismo, solicitó que se condenara a los demandados a indemnizarla por los daños y perjuicios sufridos como consecuencia de sus actuaciones negligentes e ilegales.

Luego de haber contestado la demanda[4], el 20 de julio de 2000 los codemandados Lebrón Morges y el Lcdo. Rey presentaron una moción solicitando la consolidación de la demanda presentada por la heredera con el caso de expedición de cartas testamentarias, por entender que

---

[4] El Banco Popular de Puerto Rico presentó su contestación a la demanda el 30 de octubre de 2000, negando todas las alegaciones de la misma.

ambos envolvían las mismas cuestiones de derecho [5]. La demandante se allanó a dicha solicitud. En virtud de ello, el foro de instancia consolidó los casos.

Así las cosas, los demandados presentaron una moción de sentencia sumaria solicitando la desestimación de la demanda alegando que el carácter de administrador del albacea estaba reconocido en el Código de Enjuiciamiento Civil y por la jurisprudencia de este Tribunal, por lo que las actuaciones de la albacea respecto a la herencia, el contrato suscrito con el Lcdo. Rey con cargo a la herencia, y las transacciones realizadas en el banco, eran cónsonas y típicas del albaceazgo.

La demandante Flecha Quiñones presentó una moción solicitando la descalificación del Lcdo. Rey como abogado de la albacea ya que, alegadamente, estaba incurriendo en conflicto de interés por ser acreedor del caudal relicto y estar ejerciendo un doble papel, la de ser codemandado y abogado de la codemandada. Argumentó, además que, como el referido demandado fue el notario autorizante en la protocolización del testamento, no procede que éste intervenga como abogado cuando se litigan asuntos que derivan directamente del contenido del testamento.

Luego de varios trámites procesales, el foro de instancia emitió una resolución, de fecha 14 de junio de 2001, mediante la cual resolvió que las facultades

---

[5] Casos número KKAC2000-3125 y KJV2000-1096, respectivamente.

concedidas a Lebrón Morges como albacea están limitadas a lo dispuesto en el Artículo 824 del Código Civil, haciendo énfasis en la obligación del albacea de informar al heredero y obtener el consentimiento para las actuaciones relacionadas con los bienes de la herencia. El foro de instancia entendió que, al haber aclarado las facultades del albacea, se tornaba innecesario decretar la nulidad de las Cartas Testamentarias. A esos efectos, el tribunal apercibió a la albacea que de excederse en sus facultades como tal y omitir consultar y obtener aprobación de la heredera Flecha Quiñones con los asuntos relacionados con los bienes de la herencia, el tribunal procedería a destituirla de su cargo, además de condenarla a restituir cualquier menoscabo que sufriera el caudal hereditario por su culpa o negligencia.

En cuanto al contrato de servicios suscrito entre el Lcdo. Rey y la albacea Lebrón Morges, el foro de instancia dispuso que esta última no estaba facultada para contratar al abogado sin la intervención ni consentimiento de la heredera, por lo cual el contrato era nulo. Asimismo, determinó que los honorarios pactados eran excesivos y en detrimento de la heredera.

En relación con los retiros y transacciones efectuadas por la albacea con las cuentas de depósitos heredadas por la demandante, el tribunal determinó que la albacea respondería frente a la demandante, siempre que sus actuaciones hubieran excedido sus obligaciones como

albacea. Además, resolvió que la albacea no podía continuar efectuando transacción alguna a no ser que dichas facultades estuvieran dentro de las contenidas legalmente en el Código Civil, artículo 824 y con el consentimiento expreso de la heredera. Por último, el tribunal descalificó al Lcdo. Rey, por entender que su participación constituía un conflicto real de interés en el caso de autos.

Inconformes con la determinación, Lebrón Morges y el Lcdo. Rey presentaron ante el Tribunal de Apelaciones un recurso de apelación[6], alegando que el foro de instancia había errado al resolver, como cuestión de derecho, que un albacea en nuestra jurisdicción no tiene facultades de administración de la herencia si el testador no se las ha señalado. De igual forma, alegaron que el foro de instancia había errado al resolver sumariamente, y sin haber celebrado el correspondiente juicio plenario, que los honorarios convenidos por la albacea y su abogado son excesivos. Finalmente, sostuvieron que el foro de instancia erró al descalificar al Lcdo. Rey sumariamente, negándole su derecho a ser oído y presentar prueba, en violación del debido procedimiento de ley.

---

[6] Aunque los codemandados presentaron escrito titulado "Recurso de Apelación" el mismo debió haberse considerado como uno de certiorari toda vez que realmente se estaba solicitando la revisión de una resolución, ya que el foro de instancia no dictó sentencia que resolviera todas las cuestiones litigiosas del pleito. De Jesús v. Corp. Azucarera de P.R., 145 D.P.R. 899 (1998).

El 13 de marzo de 2003, el foro apelativo intermedio emitió resolución confirmatoria de la actuación del foro de instancia. El referido foro entendió que el albacea no puede actuar sobre los bienes de la herencia sin el consentimiento e intervención de los herederos. Asimismo, determinó que el contrato de servicios profesionales era nulo por el hecho de que el albacea se excedió en sus facultades en el otorgamiento del mismo y porque los honorarios pactados eran excesivos. Finalmente, resolvió que fue procedente la descalificación del Lcdo. Rey por conflicto de interés ya que, al éste ser acreedor del caudal relicto, no podía ser el abogado del albacea.

Inconforme, Lebrón Morges recurrió, oportunamente, ante este Tribunal, *vía certiorari*, imputándole al foro apelativo intermedio haber errado al:

> ...confirmar la decisión del [Tribunal] de Primera Instancia, conviniendo con éste en que, como cuestión de derecho, un albacea en nuestra jurisdicción no tiene facultades de administración de la herencia si el testador no se las ha señalado expresamente.

> ...confirmar la decisión del [Tribunal] de Primera Instancia conviniendo en que éste actuó correctamente al resolver, como cuestión de hecho, sumariamente y sin haber celebrado un juicio plenario, que la testadora no le confirió facultades de administración de la herencia a la albacea peticionaria, y que los honorarios convenidos por la albacea y su abogado son "excesivos".

> ...confirmar la decisión del [Tribunal] de Primera Instancia de descalificar al abogado peticionario sumariamente, negándole su derecho a ser oído y presentar prueba respecto a la solicitud de descalificación, en violación del debido procedimiento de ley y la doctrina

judicial vigente, tanta veces reiterada por este Tribunal.

Expedimos el recurso. A continuación exponemos, en detalle, los fundamentos por los cuales estamos conforme con la Sentencia emitida en el día de hoy en el presente caso.

I

– A –

De entrada, debemos destacar que el Código Civil de Puerto Rico no define concretamente al albacea testamentario. No obstante, hemos indicado que el albacea es la persona designada por el testador para ejecutar su última voluntad. Pino Development Corp. v. Registrador, 133 D.P.R. 373, 389 (1993); Ex parte González Muñiz, 128 D.P.R. 565 (1991); Véase además: M. Albaladejo, El albaceazgo en el derecho español, Madrid, Ed. Tecnos, 1969, pág. 20. De manera que el albacea es esa persona de confianza del testador, llamada por él para cumplir y ejecutar las disposiciones del testamento, aun contra la voluntad de los interesados. Véase: E. González Tejera, Derecho de Sucesiones, Tomo II, Editorial de la Universidad de Puerto Rico, 2002, pág. 536.

Nuestra jurisprudencia ha sido, en torno al alcance de las facultades legales del albacea, una confusa y hasta

conflictiva[7]. En específico, <u>no</u> está claramente establecido si los albaceas tienen la <u>facultad legal de administrar</u> los bienes, cuando el testador no dispone lo que se va hacer al respecto[8]. Ello nos obliga a hacer una <u>breve</u> exégesis de nuestra jurisprudencia para entonces <u>reexaminar</u> el alcance de las facultades legales del albacea en nuestro ordenamiento jurídico.

Este Tribunal, por algunos años, reiteradamente resolvió que, conforme al Código Civil de Puerto Rico, el albacea no tenía la facultad de administrar la totalidad del caudal hereditario, si el causante no se la concedía expresamente. <u>Mercado</u> v. <u>Corte</u>, 62 D.P.R. 368 (1943); <u>Sucn. Pelliccia</u> v. <u>Corte</u>, 36 D.P.R. 654 (1927); <u>Crehore</u> v. <u>El Registrador de Guayama</u>, 22 D.P.R. 32 (1915). Dicho de otra forma, por aproximadamente tres décadas, sostuvimos que, si el causante no le concedía dicha facultad en el testamento, el albacea no era un administrador de los bienes del causante, ni estaba en la misma posición que el

---

[7] Véase: <u>Pino Development Corp.</u> v. <u>Registrador</u>, 133 D.P.R. 373 (1993); <u>Ex parte González Muñiz</u>, 128 D.P.R. 565 (1991); <u>Ab Intestato Marini Pabón</u>, 107 D.P.R. 433 (1978); <u>Paine</u> v. <u>Srio. de Hacienda</u>, 85 D.P.R. 817 (1962); <u>Mercado</u> v. <u>Mercado</u>, 66 D.P.R. 811 (1947); <u>Mercado</u> v. <u>Corte</u>, 62 D.P.R. 368 (1943).

[8] Véase: J.A. Cuevas Segarra y A. Román García, <u>Derecho Sucesorio Comparado</u>, Publicaciones J.T.S., 2003, pág. 352; E. González Tejera, <u>Derecho de Sucesiones</u>, Tomo II, Editorial de la Universidad de Puerto Rico, 2002, pág. 567; E. Martínez Moya, <u>El Derecho Sucesorio</u>, 67 Rev. Jur. U.P.R. 1, 73 (1998); José Ramón Vélez Torres, <u>Curso de Derecho Civil</u>, <u>Derecho de Sucesiones</u>, Tomo IV, Vol. III, Univ. Interamericana de Puerto Rico, 1992, pág. 337.

ejecutor testamentario o los administradores judiciales del Derecho sucesorio norteamericano; insistiendo en la postura de que mientras el Código Civil le limitaba las facultades al albacea, el Derecho anglosajón le confería a éste facultades amplísimas. Véase: E. González Tejera, Derecho de Sucesiones, Tomo II, Editorial de la Universidad de Puerto Rico, 2002, pág. 577.

En Mercado v. Mercado, 66 D.P.R. 811 (1947), nos enfrentamos al conflicto entre el Artículo 830 del Código Civil, 31 L.P.R.A. sec. 2527, dispositivo de que el albaceazgo es un cargo gratuito, y el Artículo 586 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2491, que fija a todo albacea una compensación por su desempeño como administrador. En dicho caso sostuvimos que la anterior jurisprudencia había ignorado por completo los preceptos del Código de Enjuiciamiento Civil que amplían las facultades que el Código Civil le confiere al albacea testamentario. Resolvimos que, conforme a las disposiciones del Código de Enjuiciamiento Civil, el albacea no es un mero custodio de los bienes del causante y lleva a cabo funciones que constituyen actos de administración, por lo que éste tenía derecho a ser remunerado[9].

---

[9] De igual forma expresamos en el referido caso que no había impedimento constitucional alguno para resolver que las reglas procesales del Código de Enjuiciamiento Civil habían modificado las normas sustantivas del Código Civil. Mercado v. Mercado, ante, a la pág. 817.

Posteriormente, en el caso de <u>Paine</u> v. <u>Srio. de Hacienda</u>, 85 D.P.R. 817, 820 (1962)[10], expresamos sobre el albacea que:

> Nada se encontrará en nuestro ordenamiento jurídico que nos permita considerar el albaceazgo como una entidad jurídica distinta a los herederos que representan. <u>El albaceazgo no es otra cosa que una administración acompañada de un derecho de representación para cumplir ciertas funciones específicas relacionadas con la conservación del caudal hereditario hasta el momento en que la herencia sea adida por los herederos</u>, y como tal, tampoco podemos considerar a los albaceas como que forman una persona jurídica distinta a los herederos. (citas omitidas).

Posteriormente, en *Ab Intestato* Marini Pabón, 107 D.P.R. 433 (1978), nos enfrentamos a una controversia en donde una viuda estaba solicitando la administración judicial de los bienes del caudal con la oposición del albacea testamentario. En dicho caso el causante no le confirió al albacea facultades de administración en el testamento. Al denegar la petición de la viuda, expresamos:

> ...<u>el albacea tiene aquellas facultades que podrían llamarse secundarias o instrumentales, que sean necesarias para el ejercicio de las otorgadas por el testador o para su normal utilización</u>, entre las que se hallan: la de vigilar sobre la efectividad de las facultades que el testador le concedió en el testamento y sostener siendo justo, en juicio o fuera de él, la validez del deseo del testador a los fines de que pueda llevar a cabo su cometido, así como

---

[10] La controversia en este caso giraba en torno a si un albacea podía representar a los herederos de una sucesión en una solicitud de reintegro de contribuciones contra el Departamento de Hacienda.

tiene dicho albacea la facultad adicional de tomar las precauciones necesarias para la conservación y custodia de los bienes con intervención de los herederos presentes, hasta el momento que la herencia del causante sea entregada. Ibíd. a las págs. 438-439

En Ex parte González Muñiz, 128 D.P.R. 565 (1991), nos enfrentamos a un caso en donde teníamos que demarcar la responsabilidad de un albacea que había sustraído dinero del caudal para su uso personal. Respecto a la cuestión de cuáles eran las facultades legales de los albaceas, expresamos que:

> En cuanto a sus facultades, el Código Civil intima que serán las expresamente conferidas por el testador, siempre que no sean contrarias a las leyes. Artículo 823 del Código Civil, 31 L.P.R.A. sec. 2520. Para los casos en que el testador no disponga facultades especiales, enumera las conferidas por ley. Artículo 824 del Código Civil, 31 L.P.R.A. sec. 2521. De particular importancia resulta la autorización al albacea, con la intervención de los herederos, a tomar las precauciones necesarias para la conservación y custodia de los bienes. Y por precauciones necesarias se visualizan las "medidas provisionales para evitar la pérdida o deterioro de aquellos, sin que, en absoluto, quede facultado para posesionarse de los mismos ni para administrarlos, salvo en cuanto las precauciones de que se trate impliquen o consistan precisamente en la tenencia o administración en cuestión". Albaladejo, op. cit., pág. 264. Véase J.L. Lacruz Berdejo, Derecho de Sucesiones, Barcelona, Ed. Bosch, 1971, Vol. I, pág. 772. Una cosa si es clara: posesionarse o utilizar los bienes del caudal, sin la autorización del tutelar, es una extralimitación en el ejercicio de su función, incompatible con la naturaleza fiduciaria del albaceazgo. Ibíd. a la págs. 571-572.[11]

---

[11] En Pino Development Corp. v. Registrador, 133 D.P.R. 373 (1993), una de las controversias giraba en torno a si un albacea podía otorgar una escritura de compraventa de un

**(Continúa . . .)**

Como podemos notar, nuestra casuística ha sido una confusa y ambigua en cuanto al alcance de las facultades legales de los albaceas. Procede entonces examinar las disposiciones pertinentes del Código Civil y del Código de Enjuiciamiento Civil con el propósito de definir claramente, de una vez y por todas, los contornos de dichas facultades en nuestro ordenamiento jurídico [12]. Veamos.

– B –

El Código Civil dispone que "los albaceas tendrán todas las facultades que expresamente les haya conferido el testador, y no sean contrarias a las leyes." Artículo 823 del Código Civil, 31 L.P.R.A. sec. 2520. En virtud de la referida disposición estatutaria, las facultades de los albaceas siempre estarán supeditadas a lo que disponga el testador, siempre y cuando no sean contrarias a la ley.

Así por ejemplo, el testador le puede encomendar al albacea velar por el cumplimiento y ejecución de la

_____

bien del caudal sin la concurrencia de los herederos forzosos. Al contestar la referida interrogante en la negativa, reiteramos nuestras expresiones en el caso de *Ab Intestato* Marini Pabón, ante, en cuanto a las facultades del albacea testamentario. Pino Development Corp. v. Registrador, ante, a la pág. 390.

[12] Cabe destacar que, al interpretar ambos cuerpos legales, tenemos que tomar en cuenta la regla de hermenéutica que establece que cuando se interpretan leyes que se refieren al mismo asunto hay que referirse a éstas las unas a las otras, por cuanto lo que es claro en un precepto puede ser tomado para explicar lo que resulte dudoso en otro. Artículo 18 del Código Civil, 31 L.P.R.A. sec. 18.

ordenación sucesoria global, o conjunta, otorgándole amplias facultades de administración, gestión y ejecución sobre la totalidad del caudal relicto[13]. Este albacea se le conoce en la doctrina civilista como universal[14]. Véase: Artículo 816 del Código Civil, 31 L.P.R.A. sec. 2513; Véase también: J.A. Cuevas Segarra y A. Román García, Derecho Sucesorio Comparado, Publicaciones J.T.S., 2003, pág. 360; José Ramón Vélez Torres, Curso de Derecho Civil, Derecho de Sucesiones, Tomo IV, Vol. III, Univ. Interamericana de Puerto Rico, 1992, pág. 347; José Castán Tobeñas, Derecho Civil Español, Común y Foral, 8va ed., Madrid, Ed. Reus, Tomo VI Vol. 2, 1979, pág. 377; José Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, Tomo V, Vol. 1, 1975, pág. 461; M. Albaladejo, *op. cit.*, pág. 235.

---

[13] El profesor González Tejera señala que la amplitud de autoridad que un testador le puede delegar a un albacea tiene pocos límites. Estos son evidentemente la ley y las actuaciones que derroten cuestiones de política pública. E. González Tejera, *op. cit.*, pág. 581.

[14] Albaladejo nos señala al respecto:

> Ahora bien, tal concepción posible en abstracto, creo que debe rechazarse en nuestro derecho común, y aceptar, en vez de ella, la de que las facultades del albacea universal son, en principio, todas las relativas, no sólo a la ejecución, en ese sentido estricto, del testamento, sino también a la gestión de los bienes y representación de la herencia en todo cuanto sea preciso para dejar ultimada por completo la sucesión. Todo lo cual puede, asimismo, calificarse, en sentido amplio, de ejecución del testamento. M. Albaladejo, *op. cit.*, pág. 235.

De igual forma, el testador le puede únicamente encomendar al albacea determinadas y específicas funciones, o también podría, no expresarse al respecto. La doctrina civilista reconoce a este albacea como uno particular. *Ibíd.*

Para los casos en que el testador no disponga en el testamento las facultades del albacea, éste tendrá las que le otorga la ley. Conforme a ello, el Artículo 824 del Código Civil, 31 L.P.R.A. sec. 2521, dispone que:

> No habiendo el testador determinado especialmente las facultades de los albaceas, tendrá las siguientes:
>
> (1) Disponer y pagar los sufragios y el funeral del testador con arreglo a lo dispuesto por él en el testamento; y en su defecto, según la costumbre del pueblo.
> (2) Satisfacer los legados que consistan en metálico, con el conocimiento y beneplácito del heredero.
> (3) Vigilar sobre la ejecución de todo lo demás ordenando en el testamento, y sostener, siendo justo, su validez en juicio y fuera de él.
> (4) Tomar las precauciones necesarias para la conservación y custodia de los bienes, con intervención de los herederos presentes.

Conforme a la referida disposición estatutaria, la doctrina civilista ha señalado que entre las <u>facultades legales</u> de los albaceas <u>no</u> se incluyen las de administrar los bienes de la herencia, <u>ni</u> disponer de los mismos, <u>ni</u> efectuar su partición. José Ramón Vélez Torres, *op. cit.*, pág. 350; José Castán Tobeñas, *op. cit.*, pág. 358; José Puig Brutau, *op. cit.*, pág. 480. Nos dice Castán al respecto:

Sería natural que se atribuyese a los albaceas todas las funciones relativas al cuidado de los bienes de la herencia, considerándose al albaceazgo como la institución llamada a satisfacer las necesidades de representación y administración del caudal hereditario durante el tiempo que media entre la muerte del testador y la consumación definitiva del derecho hereditario por parte de los herederos. <u>Pero nuestro Código Civil no refunde en los albaceas todas las funciones de la representación provisional de la herencia, sino que admite durante ese período la coexistencia de tres cargos o personalidades distintos</u>: los albaceas (...), los administradores de la herencia (...), y los contadores-partidores, encargados de practicar las operaciones particionales (...). <u>Nada impide, sin embargo, que el testador reúna las facultades de todos ellos en una sola persona</u>. José Castán Tobeñas, *op. cit.*, pág. 358

Ahora bien, en Puerto Rico, <u>el Código de Enjuiciamiento Civil expandió las facultades legales del albacea testamentario</u>. Véase: E. González Tejera, *op. cit.*, pág. 581. De esta manera, el Artículo 582 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2442, dispone en lo pertinente que:

Se cumplirá todo lo que hubiese dispuesto el testador sobre la administración de su caudal hasta entregarlo a los herederos. Cuando el testador no haya dispuesto lo que deba hacerse sobre este punto, <u>la administración de las testamentarías se ajustará a las reglas establecidas por las secs. 2241 *et seq.* de este título.</u>[15]

Conforme a la referida disposición estatutaria, <u>cuando el testador no disponga en el testamento la forma</u>

---

[15] Esta sección se refiere a Ley de Procedimientos Legales Especiales, Parte I-Juicios de Testamentarías y Abintestato, que se encuentra dentro de las disposiciones vigentes del Código de Enjuiciamiento Civil.

en que se van administrar los bienes del caudal, la administración de la herencia se llevará a cabo conforme a las disposiciones del Código de Enjuiciamiento Civil, esto es, la Ley de Procedimiento Legales Especiales. Dicho en otras palabras, los bienes del causante estarán sometidos a la administración judicial, cuando el testador no haya dispuesto nada en el testamento respecto a como se van administrar los bienes del caudal.

En esta situación, el Artículo 556 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2361, establece que el albacea testamentario podrá solicitar la administración judicial de los bienes del caudal, con exclusión de las demás personas con interés en la herencia[16]. Sólamente, en los casos en que no se hubiese designado albacea o no se dejare testamento válido, podría solicitar la administración judicial el cónyuge del causante, los herederos, forzosos o voluntarios, los legatarios o cualquier acreedor con título escrito no asegurado. *Ibíd*.

---

[16] Dicho artículo dispone en lo pertinente que:

> El albacea testamentario de la última voluntad de un finado, y en caso de que no lo hubiere nombrado o no dejare testamento con validez legal, el cónyuge de la persona finada, o cualquier heredero forzoso, o persona que se presente como heredero testamentario, o legatario, o cualquier acreedor con título escrito no asegurado que tuviere algún crédito contra la persona finada, podrá, mediante una petición debidamente justificada en que se demuestren los hechos necesarios, solicitar la administración judicial de los bienes de dicha persona finada...

A tono con lo anterior, si el testador no dispone sobre la administración de la herencia, el albacea podrá solicitar del tribunal la facultad de administrar judicialmente los bienes del caudal[17]. Si el albacea no solicita la administración judicial, sólo tendrá las limitadas facultades que le otorga el Código Civil.

De esta forma y conforme a las disposiciones del Código de Enjuiciamiento Civil, una vez el albacea la solicite y cumpla con los requisitos, el tribunal podrá, a su discreción, concederle la administración judicial de los bienes de la herencia, manteniéndose presente que el antes citado Artículo 556 establece un orden preferente. Debemos señalar, sin embargo, que las prerrogativas del albacea en los casos en que asuma la administración judicial estarán limitadas por las disposiciones del Código de Enjuiciamiento Civil[18].

Conforme a ello, cuando el albacea esté administrando judicialmente los bienes de la herencia, podrá, entre

---

[17] Resulta evidente que cuando el testador le confiere al albacea poderes plenos de administración, este último no tiene que solicitar la administración judicial. E. González Tejera, Derecho de Sucesiones, Tomo I, Editorial de la Universidad de Puerto Rico, 2002, pág. 254.

[18] Aunque el Código de Enjuiciamiento Civil expandió las facultades de los albaceas, el legislador no llegó a equipararlo al ejecutor testamentario del Derecho anglosajón. Véase: E. González Tejera, Derecho de Sucesiones, Tomo II, Editorial de la Universidad de Puerto Rico, 2002, pág. 581.

otras cosas, hacer reparaciones ordinarias[19]; podrá pagar gastos, pleitos, contribuciones y demás gastos ordinarios de administración[20]; podrá dar en arrendamiento los bienes de la herencia, cuando lo crea oportuno[21]; podrá satisfacer las deudas de la sucesión, con intervención de los herederos o, en su defecto, del tribunal[22]; y podrá vender los bienes de la herencia que se deterioren o "aquellos cuya conservación sea difícil o costosa"[23].

- C -

De otra parte, los albaceas tienen derecho a que se le reembolsen los gastos en los que incurran en el desempeño de su encargo como administrador. Conforme a ello, el Artículo 586 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2491, establece que el tribunal dispondrá "que se abonen al administrador o albacea <u>los gastos indispensables que ocasione la administración</u>, incluso el costo de los anuncios, publicaciones que la ley prescriba,

---

[19] Artículo 571 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2431.

[20] Artículo 574 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2434.

[21] Artículos 576 y 578 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2436 y 2438.

[22] Artículo 593 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2541.

[23] Artículo 579 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2439.

la conservación y guarda de los bienes, <u>consulta de abogado</u> y gastos de viaje."

El albacea, al realizar las gestiones que conlleva la administración de la herencia, con toda probabilidad incurrirá en gastos, ya sea, porque él mismo realice dichas gestiones o por razón de que se las encomiende a otros. En virtud de ello, la referida disposición estatutaria autoriza al albacea que, cuando así sea indispensable y para el ejercicio de sus funciones como administrador judicial, <u>contrate a un abogado con cargo a los bienes de la herencia</u>. Véase: E. González Tejera, *op. cit.*, pág. 556.

Ahora bien, cuando el albacea contrata los servicios de un abogado, <u>éste deberá acreditar cumplidamente la legalidad de los gastos incurridos por concepto de honorarios</u>. *Ibíd.* Para ello, el Código de Enjuiciamiento Civil le impone al albacea <u>la obligación de presentar para la aprobación del tribunal tanto cuentas trimestrales</u>[24],

---

[24] El Artículo 587 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2511, dispone en lo pertinente que:

> Los <u>administradores y albaceas presentarán en el Tribunal de Primera Instancia cuentas trimestrales de las cantidades recibidas y desembolsadas por ellos</u>, acompañadas de una declaración jurada y de un resguardo en que conste que el saldo en efectivo que de las mismas resulte queda depositado en el establecimiento bancario designado al efecto por el tribunal. Dichas cuentas serán puestas de manifiesto en secretaría a disposición de cualquiera de las partes.

como una cuenta final, de su gestión [25], en donde especificará, entre otras cosas, los gastos incurridos en el ejercicio de su gestión. Asimismo, el Artículo 589 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2513, permite que si algunas de las partes interesadas en la sucesión tienen alguna objeción a las cuentas presentadas por el albacea, incluyendo los gastos en honorarios de abogado, las pueden impugnar ante el tribunal[26].

En virtud de lo anteriormente expuesto, si una parte interesada en la sucesión impugna las cuentas presentadas,

---

[25] Artículo 588 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2512:

> Cuando el albacea o administrador haya terminado la liquidación de los bienes, renuncie o sea separado, o por cualquier otra causa cese en el desempeño de su cargo, deberá presentar al tribunal una cuenta final jurada y acompañada de los recibos y resguardos correspondientes, la cual también se pondrá de manifiesto para su inspección. Al presentarse dicha cuenta final, se citará a todas las partes interesadas en el caudal, a fin de que puedan presenciar la liquidación final de sus cuentas y se les devuelva o cancele la fianza que hubieren prestado.

[26] Dicho Artículo dispone en lo pertinente que:

> Si pasados ocho (8) días después de presentada la citación decretada por un juez de dicho tribunal ninguna de las partes hubiese hecho oposición a las cuentas, el Tribunal de Primera Instancia, si en su opinión dichas cuentas son justas y correctas, dictará auto aprobándolas y declarando exento de responsabilidad al administrador, y cancelará la fianza que hubiere constituido. Si las cuentas fueren impugnadas, se sustanciará la impugnación y se admitirán pruebas en una vista del caso y se aprobarán o desaprobarán aquéllas según el resultado de la vista.

el tribunal tendrá que celebrar una vista que le permita al albacea demostrar la legalidad de los gastos incurridos. *Ibid*. Luego de celebrarse la vista, el tribunal podrá aprobar las cuentas presentadas o cuando sea necesario las modificará con cargo al albacea, Artículo 590 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2514[27].

II

Los peticionarios, en su primer señalamiento de error, sostienen que el Tribunal de Apelaciones erró al confirmar al foro de instancia y disponer que un albacea en nuestra jurisdicción no tiene facultades de administración de la herencia si el testador no se las ha señalado expresamente. Los peticionarios argumentan que el carácter de administrador del albacea está reconocido en el Código de Enjuiciamiento Civil y por la jurisprudencia de este Tribunal, por lo que la Sra. Lebrón Morges no se extralimitó en sus facultades legales. Analizamos los hechos ante nos.

En el presente caso, la causante Orraca López otorgó un testamento ológrafo en el cual nada dispuso sobre la

---

[27] Dicho artículo dispone en lo pertinente que:

> El Tribunal de Primera Instancia dictará auto definitivo, bien aprobando la cuenta presentada o haciendo en ella modificaciones y alteraciones con cargo al albacea o administrador que el derecho y la justicia reclamen; contra dicho auto podrá interponerse recurso de apelación.

administración de sus bienes. Asimismo, nombró albacea a la Sra. Lebrón Morges con "con todas las potestades que concede la ley y por todo el tiempo que resultare necesario para los trámites legales correspondientes, relevándola expresamente de la prestación de fianza." A tenor con la referida disposición testamentaria se desprende claramente que el testador le concedió a la albacea las facultades que le concede la ley.

Ahora bien, la albacea compareció ante el foro de instancia solicitando que se le expidieran cartas testamentarias a su favor para que, conforme a las disposiciones del Código de Enjuiciamiento Civil, le reconocieran su autoridad en relación con todas las facultades que le concede la ley. El foro de instancia le expidió a la albacea las cartas testamentarias solicitadas "facultándola [para] que en cuanto no sea incompatible con la ley o con la última voluntad del testador, tome posesión de todos los bienes de la finada, desempeñando, respecto a los mismos todos los poderes, facultades y obligaciones que le señalan la ley, y fueron encomendados por la testadora." (énfasis suplido).

Luego que se le expidieran las cartas testamentarias, la albacea tomó posesión de todos los fondos que la testadora tenía depositados en el Banco Popular de Puerto Rico, los cuales fueron utilizados para saldar las obligaciones de la causante con dicha institución bancaria y poner al día los pagos vencidos que correspondía pagar.

El sobrante fue transferido a una cuenta corriente que la albacea abrió en dicho banco a nombre de la sucesión de Orraca López. Tanto el foro de instancia como el foro apelativo intermedio determinaron que, como la albacea Lebrón Morges no tenía la facultad de administrar, ésta se extralimitó en sus facultades al realizar el pago de las obligaciones y deudas del caudal. Su determinación a esos efectos es, parcialmente, correcta.

Como se mencionara anteriormente, el Código de Enjuiciamiento Civil le otorga al albacea la facultad de solicitar la administración judicial de los bienes del causante, cuando el testador no disponga sobre la forma de administrar los mismos. Artículo 556 del Código de Enjuiciamiento Civil, ante. Por lo tanto, cuando Lebrón Morges solicitó y obtuvo del Tribunal, conforme a las disposiciones del Código de Enjuiciamiento Civil, las cartas testamentarias a favor de ésta facultándola a tomar posesión de los bienes y ejercer sobre éstos todas las facultades que le concede la ley, ciertamente dicha petición y autorización incluyó la facultad que le concede el referido cuerpo legal de administrar judicialmente los bienes de la causante. Ello no obstante, Lebrón Morges no tenía autoridad para saldar, por sí sola, las obligaciones o deudas del caudal en controversia ya que el Artículo 593 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2541, expresamente requiere que esa gestión sea realizada con la

intervención de los herederos o, en su defecto, del tribunal, lo cual no se hizo en este caso.[28]

En conclusión, somos del criterio que la albacea Lebrón Morges es, para todos los efectos legales, la administradora judicial de los bienes de la herencia de Orraca López. En virtud de ello, la albacea como administradora judicial podía posesionarse de los bienes de la causante y ejercer sobre éstos todas las facultades que le concede la ley.

III

Por otro lado, en su segundo señalamiento de error, los peticionarios sostienen que erró el foro apelativo intermedio al resolver, sumariamente, que la testadora no le confirió facultades de administración de la herencia a la albacea y que los honorarios convenidos por ésta y el Lcdo. Rey son excesivos. En cuanto a las facultades conferidas en el testamento a la albacea, como ya indicáramos anteriormente, la testadora le confirió las que le concede la ley. Era innecesario, por lo tanto, celebrar una vista sobre ese aspecto.

Ahora bien, el foro apelativo intermedio, confirmando al foro de instancia, determinó "sumariamente" que el

---

[28] En virtud de lo antes expuesto, el foro de instancia deberá determinar si esta actuación de Lebrón Morges —a saber, el pago de las deudas del caudal sin la intervención de la heredera o, en su defecto, del tribunal— le causó algún perjuicio a Flecha Quiñones.

contrato otorgado entre la albacea y el Lcdo. Rey era nulo porque el albacea sobrepasó sus facultades legales al otorgarlo y porque los honorarios pactados eran excesivos.

En cuanto a la facultad para otorgar el contrato con el abogado, como ya indicáramos, el albacea como parte de su gestión puede, cuando así sea indispensable y para el ejercicio de sus funciones como administrador judicial, contratar a un abogado con cargo a los bienes de la herencia. Artículo 586 del Código de Enjuiciamiento Civil, ante. A tono con lo anterior, no debe caber la menor duda que en el presente caso la albacea Lebrón Morges tenía la facultad legal de contratar a un abogado para que la representara en los trámites legales relacionados al ejercicio de su gestión como administradora judicial de los bienes de la causante.

Respecto a la razonabilidad de los honorarios pactados, entendemos que la determinación que hicieran los referidos foros, sobre lo excesivo de los mismos, <u>fue una prematura e improcedente</u>. De conformidad con el contrato, el Lcdo. Rey recibiría honorarios equivalentes al 15% del valor del caudal hereditario de la causante Orraca López. No obstante, según surge del expediente del caso, el Lcdo. Rey no ha presentado hasta el momento ninguna factura en donde justifique cuales eran las gestiones profesionales efectuadas y la cantidad exacta de los honorarios.

Por lo tanto, resulta sorprendente que, tanto el foro de instancia como el foro apelativo intermedio,

determinaran, <u>sumariamente</u>, que los honorarios pactados entre la albacea y el Lcdo. Rey eran excesivos cuando ni tan siquiera sabían cuales eran los trabajos realizados por el Lcdo. Rey ni la cantidad exacta de los honorarios.

Como mencionáramos anteriormente, las disposiciones del Código de Enjuiciamiento Civil le imponen al albacea la obligación de presentar cuentas trimestrales y una cuenta final de su gestión. En dichas cuentas el albacea <u>justificará</u> todos los gastos incurridos como parte de su gestión, <u>incluyendo los honorarios de abogado</u>. Dichas cuentas siempre estarán sujetas a la aprobación final del tribunal. Artículo 589 del Código de Enjuiciamiento Civil, ante.

Conforme a ello, es en el momento en que el albacea somete al tribunal las cuentas sobre su gestión en el cual se evaluará la razonabilidad de los honorarios pactados con los abogados y se le permitirá a las partes interesadas en la herencia impugnar los mismos. De igual forma, se celebrará una vista en donde se le dé una oportunidad a todas las partes para presentar sus respectivas posiciones en cuanto a la razonabilidad, o no, de dichos honorarios. *Ibid.*

En virtud de lo anteriormente expuesto, somos de la opinión que erraron tanto el foro de instancia como el foro apelativo intermedio al resolver que el contrato suscrito por la albacea Lebrón Morges y el Lcdo. Rey era nulo porque los honorarios pactados eran excesivos. Cuando

la albacea someta al tribunal las cuentas con todos los detalles de su gestión, es que el foro de instancia estará en posición de evaluar la validez de los honorarios pactados entre la albacea y el Lcdo. Rey, ello luego de celebrar una vista para que conforme a la prueba presentada pueda tomar una determinación sobre la procedencia de dicho gasto.

IV

En cuanto a la descalificación del abogado, sabido es que dicho procedimiento no constituye una acción disciplinaria de parte del foro de instancia. Las mociones de descalificación son mas bien medidas preventivas para evitar posibles violaciones a los Cánones de Ética Profesional. K-Mart Corp. v. Walgreen's, Inc., 121 D.P.R. 633, 637 (1988). A ello responde que, en el ejercicio de su poder inherente para tomar medidas dirigidas a supervisar y controlar la conducta de los abogados que postulan ante sí, el Tribunal de Primera Instancia puede descalificar abogados sin menoscabar nuestra jurisdicción original y exclusiva para atender acciones disciplinarias. Ibíd., págs. 637-638.

Por lo tanto, la mera presentación de una moción de descalificación no significa que proceda la misma. Al evaluar este tipo de moción, prevalece un criterio de aproximación judicial que conduce a una evaluación de los hechos particulares de cada caso y las circunstancias que

los rodean, balanceando el prejuicio que pueden sufrir el cliente y su abogado. *In re* Carreras Rovira y Suárez Zayas, 115 D.P.R. 778 (1984).

De esta manera, el tribunal *motu proprio* puede decretar la descalificación de un abogado en aquellos casos en los cuales éste asume la representación de ambos clientes a pesar de la existencia de un posible conflicto. En tales casos no resulta necesario que se aporte prueba sobre una violación ética, ya que la mera apariencia de impropiedad podrá ser utilizada, en caso de duda, a favor de la descalificación. Otaño v. Vélez, ante; Liquilux Gas Corp. v. Berríos, Zaragoza, 138 D.P.R. 850 (1995); *In re* Carreras Rovira y Suárez Zayas, ante.

En las situaciones en que sea la parte contraria quien solicite la descalificación, el tribunal deberá considerar los siguientes criterios, a saber: (a) si quien solicita la descalificación tiene legitimación activa para invocarla; (b) la gravedad del conflicto de interés implicado; (c) la complejidad del derecho o los hechos pertinentes a la controversia y el *expertise* de los abogados involucrados; (d) la etapa de los procedimientos en que surja la controversia sobre la descalificación y su posible efecto en cuanto a la resolución justa, rápida y económica del caso; y (e) el propósito detrás de la descalificación, es decir, si la moción de descalificación está siendo utilizada como mecanismo procesal para dilatar

los procedimientos. <u>Otaño</u> v. <u>Vélez</u>, ante; <u>Liquilux Gas Corp.</u> v. <u>Berríos, Zaragoza</u>, ante.

Al considerar esta serie de factores, <u>el tribunal deberá sopesar, además el derecho que le asiste a todo ciudadano de escoger con libertad el abogado que lo represente</u>. Véase: <u>Sánchez Acevedo</u> v. <u>E.L.A.</u>, 125 D.P.R. 432, 438 (1990); <i>In re</i> <u>Vélez</u>, 103 D.P.R. 590, 599 (1975). De igual forma, <u>el tribunal velará por que el abogado, cuya descalificación se solicita, tenga al menos de la oportunidad de ser oído y poder presentar prueba en su defensa</u>. Véase: <u>Otaño</u> v. <u>Vélez</u>, ante.

En el presente caso los abogados de la demandante solicitaron la descalificación del Lcdo. Rey. El foro de instancia descalificó, <u>sumariamente</u>, al Lcdo. Rey sin obviamente haber sopesado los factores anteriormente mencionados al descalificarlo[29]. De igual manera, el foro de instancia no le permitió al Lcdo. Rey expresarse, y presentar prueba a su favor, para demostrarle al tribunal que no existía ningún conflicto de interés en la representación legal de la albacea. El foro apelativo intermedio confirmó esta determinación del foro de instancia. Erró al así hacerlo.

En este caso fue la parte contraria la que presentó la moción de descalificación. Lo que procede es

---

[29] En su resolución el foro de instancia determinó que existía un conflicto de interés sin hacer mención alguna de los criterios anteriormente mencionados.

que el foro de instancia celebre una vista para permitirle al abogado defender su posición y darle la oportunidad de tratar de demostrar que no existe conflicto de interés alguno en la representación legal de la albacea. De esta manera, el foro de instancia determinará, luego de sopesar los criterios antes mencionados, si procede o no la descalificación del Lcdo. Rey[30].

V

Por los fundamentos antes expuestos, es que estamos contestes en que procede revocar la resolución emitida por el Tribunal de Apelaciones y devolver el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con lo aquí expuesto.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado

---

[30] De igual forma, queremos dejar claro que no estamos pasando juicio sobre si en este caso existe un conflicto de interés del Lcdo. Rey. Esa determinación le compete al Tribunal de Primera Instancia, luego de celebrada la vista.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Dionisia Flecha Quiñones

    Demandante Recurrida

      v.                          CC-2003-488

Carmen Elizabeth Lebrón Morges,
José Angel Rey y Banco Popular
de Puerto Rico

    Demandados Peticionarios
    los dos Primeros


Opinión de conformidad, concurrente y disidente de la Juez Asociada señora Rodríguez Rodríguez



San Juan, Puerto Rico, a 23 de noviembre de 2005

Estoy conforme con la Sentencia del Tribunal en cuanto revoca la determinación del foro apelativo de descalificar al abogado que ostenta la representación de la albacea en este itigio, porque también entiendo que no procedía tan drástico remedio sin ofrecer una oportunidad a éste de argumentar los méritos de la controversia. De otro lado, concurro con la determinación de dejar sin efecto la anulación del contrato de servicios profesionales del abogado de la albacea.

Nos vemos precisados, sin embargo, a disentir porque no compartimos el criterio que subsume la Sentencia en este caso que permite que un albacea a

quien el testador instituyó como tal "con todos las potestades que concede la ley", ostente, inherente al cargo, la facultad de administración de los bienes del causante. Nos parece además que la determinación de la Sentencia de que en este caso la albacea "es, para todos los efectos legales, la administradora judicial de los bienes de la herencia" de la causante, no apura adecuadamente el alcance del procedimiento de administración judicial de los bienes del finado que autoriza el Código de Enjuiciamiento Civil.

I

El óbito de la licenciada Ivette Josefina Orraca López acaeció el 2 de marzo de 2000 en San Juan, Puerto Rico. Ésta falleció sin dejar ascendientes ni descendientes y habiendo otorgado testamento ológrafo el 21 de mayo de 1999.

Este testamento fue protocolizado por orden del Tribunal de Primera Instancia, Sala de San Juan, mediante la escritura número 11 otorgada el 6 de junio de 2000 ante el notario José Ángel Rey, codemandado en este caso. En el testamento, la causante instituyó como su albacea testamentaria a la señora Elizabeth Lebrón Morges (la "albacea") "con todas las potestades que confiere la ley" y relevándola de la prestación de fianza. La licenciada Orraca López instituyó como su "única y universal heredera del caudal" a la señora Dionisia Flecha Quiñones. La señora Flecha fue designada también albacea sustituta.

En el testamento ológrafo, la licenciada Orraca hizo varios legados de bienes muebles e inmuebles a la albacea testamentaria. De otra parte, entre los bienes heredados por

la señora Flecha se encuentran cuentas bancarias de la causante en el Banco Popular de Puerto Rico ("Banco Popular"). Se dispuso en el testamento que "cualquier deuda garantizada por ahorros será discreción de la heredera saldarlo o continuar pagándolo."

Oportunamente, la albacea solicitó se expidiesen las cartas testamentarias a su nombre a tenor con lo dispuesto en el Artículo 597 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2571. Así, el 8 de junio de 2000 el Tribunal de Primera Instancia expidió las correspondientes cartas testamentarias. En su resolución, el tribunal indicó lo siguiente respecto la albacea: "facultándola que en cuanto no sea incompatible con la ley o con la última voluntad del testador, tome posesión de todos los bienes de la finada, desempeñando, respecto a los mismos todos los poderes, facultades y obligaciones que le señalan la ley, y fueron encomendados por la testadora."

Con anterioridad, el 13 de marzo de 2000 y posteriormente el 11 de mayo de 2000, la albacea y el licenciado Rey otorgaron un contrato de servicios profesionales. El licenciado Rey se comprometió en el mismo a prestar a la albacea y legataria todos los servicios legales necesarios para que ésta pudiera desempañar cabalmente las funciones del cargo.[31] El licenciado Rey, se

---

[31] En el contrato de servicios profesionales se pactó que el licenciado "Rey recibiría una remuneración equivalente al 15% del valor del caudal hereditario de la fenecida y que de iniciarse un pleito relacionado con las facultades de la albacea, los honorarios se determinarían separadamente a razón de $150.00 por hora." Véase, Apéndice, pág. 38(b).

obligó también a llevar a cabo todas las gestiones necesarias para traer al caudal hereditario de la licenciada Orraca los bienes que ella había heredado de su madre, quien había fallecido en febrero de 1999 y cuya herencia no había sido liquidada.[32]

Expedidas las cartas testamentarias la albacea tomó posesión de todos los fondos que la testadora tenía depositados en el Banco Popular. Los fondos fueron utilizados para, entre otras cosas, saldar en su totalidad casi todas las obligaciones de la licenciada Orraca con el Banco y poner al día unos pagos vencidos que correspondía pagar a la heredera señora Flecha. **La heredera no fue informada de estas transacciones antes de efectuarse las mismas.** El 12 de junio de 2000, el licenciado Rey le remitió una carta al Lcdo. Lucas Irisarri Castro, abogado de la heredera, detallándole las gestiones llevadas a cabo respecto los bienes del caudal de la causante.

En esa misma fecha, la heredera instó una demanda contra la albacea, el licenciado Rey y el Banco Popular. En la demanda se solicitó, en síntesis, que se declararan nulas las cartas testamentarias expedidas a favor de la albacea y las facultades que allí se le concedían, por exceder lo

---

[32] Surge del expediente que el Lcdo. José Ángel Rey había sido abogado tanto de la causante como de la madre de ésta; habiendo desempeñado distintas gestiones legales para ambas, incluyendo la liquidación del caudal de esta última. Surge también del apéndice del caso que el licenciado Rey es uno de los acreedores del caudal de la licenciada Orraca. El caudal refleja una deuda a favor del licenciado Rey, ascendente a $24,766.30 en honorarios profesionales prestados tanto a la licenciada Orraca, en vida de ésta, como a su madre, doña Francisca López vda. de Orraca. Apéndice, pág.

autorizado por la testadora. Además, se solicitó que la albacea se abstuviera de llevar a cabo gestión alguna de representación o administración y de partición de la herencia. Se solicitó también, que se declara nulo el contrato de servicios profesionales suscrito con el licenciado Rey y que éste se abstuviese de continuar representando a la heredera. Se solicitó se restituyeran al caudal los honorarios pagados al licenciado Rey y que se le reembolsase cualquier suma de dinero que se hubiese retirado de los fondos depositados en el Banco Popular.

Los demandados contestaron la demanda y negaron las imputaciones en su contra. Indicaron en su contestación, que los planteamientos relacionados con las facultades y deberes de la albacea eran prematuros. Se adujo que los mismos debían presentarse como parte del procedimiento de aprobación de las cuentas finales que el albacea tiene que rendirle al tribunal de conformidad con lo dispuesto en los artículos 588 y 589 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2512, 2513.

En agosto de 2000, los demandados presentaron ante el tribunal de instancia una moción de sentencia sumaria solicitando la desestimación de la demanda instada. Se alegó en la moción que las gestiones llevadas a cabo por la albacea son "las labores típicas que al albaceazgo le fija la ley, a saber, toma posesión del caudal, satisfacer sus obligaciones y los gastos de administración, y poner la herencia neta a disposición de los herederos." Se solicitó en su

consecuencia que se dictara sentencia sumaria desestimando la demanda.

La demandante replicó y solicitó sentencia sumaria parcial a su favor. En la moción presentada se solicitó la descalificación del licenciado Rey por alegado conflicto de intereses. Solicitud ésta que fue reiterada en dos ocasiones adicionales por la parte demandante.

Luego de varios trámites procesales, en junio de 2001, el tribunal de instancia dictó sentencia sumaria parcial en la cual dispuso, primero, que las facultades concedidas a la señora Lebrón como albacea, se limitaban a lo dispuesto en el Artículo 824 del Código Civil, 31 L.P.R.A. sec. 2522. Aclarado este aspecto, el tribunal de instancia entendió innecesario decretar la nulidad de las cartas testamentarias. El foro *a quo* apercibió a la albacea que de exceder sus facultades, como por ejemplo no consultar y obtener la aprobación de la heredera respecto los asuntos relacionados con los bienes de la herencia, el tribunal procedería a destituirla de su cargo, además de condenarla a restituir cualquier menoscabo que sufriera el caudal hereditario por su culpa o negligencia.

Respecto al contrato de servicios profesionales suscritos entre la albacea y el licenciado Rey, el Tribunal de Primera Instancia dispuso que la albacea no estaba facultada para contratar con dicho abogado sin la intervención ni consentimiento de la heredera por lo que el mismo era nulo. Determinó además que los honorarios pactados en el contrato eran excesivos. El tribunal descalificó al

licenciado Rey al concluir que su participación como abogado representaba un conflicto de interés.

Inconformes, la albacea, el licenciado Rey y el Banco Popular apelaron ante el Tribunal de Apelaciones. En el escrito presentado se planteó que el foro primario erró al resolver el caso sumariamente. Se adujo que para resolver si la albacea tenía facultad para administrar los bienes del caudal se requería la celebración de una vista en su fondo; así como también que para determinar si los honorarios del licenciado Rey eran excesivos. El licenciado Rey a su vez, arguyó que se le negó el debido proceso de ley al descalificarlo sumariamente como abogado del caso.

El 13 de marzo de 2003, el Tribunal de Apelaciones dictó sentencia en el caso confirmando la determinación del foro primario. El foro apelativo concluyó que las facultades del albacea son aquellas provistas en el Artículo 824 del Código Civil, 32 L.P.R.A. sec. 2522. Concluyó además que "el albacea viene obligado a obtener el consentimiento e intervención de los herederos en las actuaciones relacionadas con los bienes de la herencia." En vista de que ello no había ocurrido así en este caso, procedió a confirmar al tribunal de instancia.

El tribunal apelativo sostuvo la determinación de descalificar al licenciado Rey. Indicó en la sentencia que éste ostentaba la representación legal de la albacea y de la sucesión, a la misma vez que era uno de los acreedores del caudal relicto, a base de lo cual concluyó que se constituyó un conflicto de intereses entre el licenciado Rey como

acreedor del caudal hereditario y, su función de abogado de la albacea.

Inconforme nuevamente la albacea y el licenciado Rey acudieron en alzada ante este Tribunal. Los peticionarios, descansando principalmente en *Mercado v. Mercado*, 66 D.P.R. 811 (1947), arguyeron que en Puerto Rico, el albacea goza de la facultad de administración del caudal relicto por lo que la interpretación del foro apelativo intermedio sobre este particular era errónea y debía ser revocada. Cuestionaron también que se avalara la decisión de descalificar al licenciado Rey, así como la determinación de anular el contrato de servicios profesionales y lo relacionado con los honorarios pactados.

Expedimos el auto y ambas partes comparecieron en extensos alegatos. En el día de hoy, mediante Sentencia el Tribunal revoca la sentencia dictada por el foro apelativo intermedio.

La sentencia dictada tiene el efecto de concluir que bajo nuestro ordenamiento, el albacea particular está facultado para administrar el caudal hereditario como parte de las funciones inherentes al cargo y, que una vez se expiden las cartas testamentarias, éste puede tomar posesión de los bienes de la herencia y administrar los mismos. No compartimos esa visión. Somos del criterio, que dicha interpretación desvirtúa la naturaleza del albaceazgo permitiendo circundar la última voluntad del testador.

Esta conclusión, a mi juicio, se asienta sobre una errónea interpretación de las disposiciones del Código de

Enjuiciamiento Civil; así como también en una expansiva interpretación de las expresiones que, a modo de *obiter dictum,* se hicieron en *Mercado v. Mercado, ante.* Expresiones, que justipreciadas en el contexto de la figura del albacea que nos llega del Código Civil de España, no se justifican. Debo consignar que no comparto este criterio.

## II

## A

La controversia central del caso de epígrafe gira en torno el alcance de las facultades que se le confieren al albacea en nuestro Derecho sucesorio. Entiendo conveniente, previa a la discusión sobre este asunto, iniciar la misma con unas muy breves reflexiones sobre los dos grandes sistemas de Derecho de sucesiones por causa de muerte, a saber: el sistema de base romana y el angloamericano. Como veremos más adelante, ello es necesario dada la tensión que origina la confluencia de las dos tradiciones jurídicas, la angloamericana y la europea continental en el Derecho Puertorriqueño.

En el sistema de base romana, como el nuestro, la herencia no está concebida como un patrimonio en liquidación, sino en conservación, para facilitar el cambio de titular. Ello, teniendo como presupuesto teórico que el fallecimiento del causante no provoca la extinción de sus relaciones jurídicas pues los herederos son llamados a colocarse en su lugar. Es decir, el heredero se subroga en el lugar del causante como nuevos titulares de los mismos derechos y obligaciones. Véase, E. González Tejera, *Derecho de*

*Sucesiones*, Ed. Universidad de Puerto Rico, San Juan, Puerto Rico, 2002, Tomo 2, capt. VIII.

Por otro lado, el Derecho sucesorio angloamericano parte de un presupuesto totalmente opuesto.  La muerte del causante es la ocasión idónea para liquidar sus relaciones jurídicas y, una vez ello ocurra y se liquiden todas las deudas pendientes, los herederos adquieren el líquido restante. "Por ello, en Derecho angloamericano los bienes del fallecido pasan ante todo a un ejecutor o administrador que tiene la misión de liquidar el patrimonio relicto y de atribuir el saldo activo restante a los beneficiarios.  Si el causante no ha nombrado al ejecutor, éste es designado por la 'Division of Probate' . . . ."  L. Roca-Sastre Muncunill, *Derecho de Sucesiones*, Ed. Bosch, España, 2000, Vol. IV, pág. 313.

Pasamos entonces a ver detenidamente la figura del albacea.

B

El albacea es  la persona nombrada por el testador para asegurar el fiel cumplimiento de su voluntad.  González Tejera, *op. cit.*, pág. 536 (Es "la institución por cuya virtud una o más personas nombradas por el testador, por el juez, o designada por la ley asumen la misión de cerciorarse de que se cumpla la voluntad del causante y, en los casos adecuados, consevar transitoriamente los bienes de la herencia.")  El albacea "no solo ejecuta sino que asimismo vigila la ejecución."  M. Albaladejo, *El albaceazgo en el Derecho español*, Ed. Tecnos, Madrid, España, 1969, pág. 23. En igual sentido, López Vilas, Configuración jurídica del

albacea, en *Derecho español en Estudios de Derecho civil en honor del Prof. Castán Tobeñas*, Ed. Universidad de Navarra, Pamplona, España, Tomo VI, 1969, pág. 831.  Es una figura asentada primordialmente sobre una relación de confianza entre el testador y el albacea.  González Tejera, *op. cit.*, pág. 551; Albaladejo, *op. cit.*, pág. 20.

Royo Martínez nos indica con atino que el Código Civil, respetuoso del testador, procura en sus disposiciones más que deslindar conceptos y atribuciones, "instaurar un sistema de pesos y contra pesos que aseguren la sumisión de los herederos a quien es ejecutor de la voluntad del causante, y, al propio tiempo, **la sumisión del ejecutor a la voluntad testamentaria**."  Royo Martínez, *Derecho Sucesorio "mortis causa"*, Ed. Edelce, Sevilla, España, 1951, pág. 313. (Énfasis nuestro.)

La figura del albacea descrita en el Código Civil resulta ser entonces de suyo, una figura problemática en el Derecho de sucesiones, "en cuanto que, mediante ella, se arrebatan a éste [al heredero] y se transmiten a un tercero [al albacea] importantes funciones . . ., de modo que el albaceazgo puede ser considerado como una tajante limitación a la situación normal del heredero."  Roca-Sastre Muncunill, *op. cit.*, pág. 315. [33]  Con gran elocuencia Roca-Sastre

---

[33] Puig Brutau expresa igual posición cuando indica:
> [U]na de las causas de los problemas del albaceazgo suscita en nuestro Derecho consiste en la concurrencia de la sucesión romana, que exige una administración conservadora entre el interés del sucesor, con el albaceazgo, que corresponde a las funciones de una administración liquidadora interpuesta entre el Derecho del causante y del

**(Continúa . . .)**

Muncunill nos advierte que todo ello redunda en una gran confusión "no solo en la doctrina sino también en la jurisprudencia, cuya confusión empieza sobre la misma calificación o naturaleza jurídica del albaceazgo." Roca-Sastre Muncunill, *op. cit.*, pág. 315.

El albaceazgo queda regulado en el Código Civil en los Artículos 814-832, 32 L.P.R.A. secs. 2515 *et seq.* De estas disposiciones se desprende que éste es un cargo que goza de los siguientes caracteres: ser voluntario, renunciable, remunerado[34] y temporal. Hay además distintos tipos de albaceas, a saber: universales o particulares, dependiendo de las funciones que se les ha encomendado; mancomunados, solidarios o sucesivos, dependiendo del número y forma de nombramiento; y, testamentarios, legítimos y dativos, en atención a su origen.

De las clasificaciones antes indicadas, en esta ocasión, nuestra atención se centra en la distinción entre el albacea universal y el particular. Las facultades que pueda tener un albacea parten de lo dispuesto en el Artículo 823 del Código

_____

de los herederos, reducidos a ser los destinatarios del remanente.
J. Puig Brutau, *Fundamentos del Derecho Civil,* Ed. Bosch, Barcelona, España, Tomo V. Vol. 1, 3ra ed., 1990, pág. 399.

[34] En Puerto Rico, en virtud del Artículo 586 del Código de Enjuiciamiento Civil, el cargo de albacea es remunerado, no así en España. Véase discusión n. 6, *infra.* Lo cierto es que, no empece que el Código Civil español claramente indica que el albaceazgo es gratuito, en la doctrina moderna española hay una clara tendencia a cuestionar el principio de gratuidad del albaceazgo en consideración a la complejidad que en muchas ocasiones pueden presentar las funciones del albacea. L. Puig Ferriol, *El Albaceazgo*, Ed. Bosch, Barcelona, España, 1967; F. Marín Castán en Sierra Gil del la Cuesta, *Comentarios del Código Civil*, Ed. Bosch, Barcelona, España, 2000, Tomo 5.

Civil, 31 L.P.R.A. sec. 2520, donde se dispone que "los albaceas tendrán todas las facultades que expresamente les haya conferido el testador, y no sean contrarias a las leyes."

Se consideran albaceas universales aquellos a quienes se encomienda de modo global la total ejecución de la voluntad del testador, confiriéndole a éste todas las facultades precisas y necesarias para tal ejecución. Albaladejo, *op. cit.*, pág. 58; González Tejera, *op. cit.*, pág. 557; J. Vélez Torres, *Curso de Derecho Civil*, Ed. Universidad Interamericana, San Juan, Puerto Rico, Tomo IV, Vol. III, 1987, pág. 347. Afirma Albaladejo que "le compete [al albacea universal] apoderarse de la herencia, administrarla y gestionar lo relativo a ella, liquidarla, verificando el pago de deudas, cargas y legados, dividirla y entregar a cada heredero la parte que le corresponda, así como defender, mientras que la ejecución dura, el testamento y los bienes hereditarios, y hasta la de enajenar bienes . . . ." *Ibíd*, pág. 238.

El acto de administración es el "acto jurídico que recayendo sobre un bien determinado o sobre un conjunto universal de bienes igualmente individualizados, tiende ya a la puesta en explotación de los mismos, ya a la percepción y utilización de sus productos sin comprometer en modo alguno su valor, la individualización y la permanencia de dichos bienes en el seno del patrimonio." M. Gitrama, *La Administración de Herencia en el Derecho español*, Ed. Rev. D. P., Madrid, España, 1950, pág. 28.

En cambio, el albacea particular ostenta solo una o varias atribuciones concretas señaladas por el causante, o en defecto de éstas, las que atribuye la ley. L. Puig Ferriol, *El Albaceazgo*, Ed. Bosch, Barcelona, España, 1967, pág. 130. Son "particulares porque sólo tienen las facultades que enumera el precepto y no las generales de llevar a cabo o asegurar el total cumplimiento de la última voluntad del testador." F. Marín Castán en Sierra Gil de la Cuesta, *Comentarios del Código Civil*, Ed. Bosch, Barcelona, España, 2000, tomo 5, pág. 156; Albaladejo, *op. cit.*, págs. 246-47; Puig Brutau, *op. cit.*, 443; Vélez Torres, *op. cit.*, pág. 347 ("el particular es el nombrado sin otorgamiento específico de facultades, en cuyo caso tendrán las legales, o reconociéndole el testador funciones determinadas.") Véase además, Alpañés Domínguez, Albaceazgo de realización y albaceazgo de entrega, 48 *Rev. D. P.* 1033, 1052 (1964) ("Es a falta de especificación por el testador cuando entra en juego el Art. 902.")

El Artículo 824 del Código Civil, 31 L.P.R.A. sec. 2521, enumera las facultades que la ley reconoce al albacea. Son éstas: (i) disponer y pagar los sufragios y el funeral del testador con arreglo a lo dispuesto en el testamento; o, en su defecto, según la costumbre del pueblo; (ii) satisfacer los legados que consistan en metálico, con el conocimiento y beneplácito de los herederos; (iii) vigilar sobre la ejecución de todo lo demás que haya ordenado el testador y sostener, siendo justo, la validez del testamento en juicio o fuera de él; y, (iv) tomar las precauciones necesarias para

la conservación y custodia de los bienes, **con la intervención de los herederos presentes.**[35]

No obstante, Albaladejo, en su tratado sobre el albaceazgo reconoce que el albacea particular tendrá, además de las funciones singularmente fijadas por ley, "todas las secundarias o instrumentales necesarias para el ejercicio de aquellas." Albaladejo, *op. cit.*, pág. 247. Es decir, tendrá además las que sean precisas, necesarias y apropiadas para descargar su encomienda. Albaladejo, sin embargo, deja claro que no le "corresponde por ley al albacea particular la facultad de pagar deudas . . ., salvo concesión del testador, ni le compete vender bienes para tal pago, salvo también esto, concesión de aquel. Sí es misión tal pago de los albaceas universales . . . ." *Loc. cit.* Es de notar, que el Código Civil no reconoce al albacea particular facultades generales de administración, en ausencia de expresión específica del testador.

Con ello en mente, pasemos a discutir cuál ha sido el tratamiento que ha recibido la figura del albacea particular en nuestro ordenamiento, especialmente en lo que se refiere a la facultad de administrar el caudal relicto.

---

[35] Sobre esta última facultad nos dice el profesor O´Callahan Muñoz en *Código Civil comentado y con jurisprudencia*, Ed. La Ley-Actualidad, Madrid, España, 1996, pág. 843, **"se reduce a la simple toma de precauciones, para la conservación y custodia de los bienes. Las que no puede tomar por si solo, sino con la intervención de los presentes**, no los ausentes, entendiendo este término en sentido vulgar, no en el jurídico declaración de ausencia." (Énfasis nuestro.)

III

Nuestra jurisprudencia sobre este tema ha sido algo vacilante. Durante años, sostuvimos que el albacea no era un administrador de los bienes del finado, ni estaba en la misma posición que el ejecutor testamentario o los administradores judiciales del Derecho sucesorio angloamericano. Haciéndonos eco de la normativa civilista, sostuvimos por décadas que el Código Civil le concedía facultades limitadas al albacea particular. Así en *Crehore v. Registrador*, 22 D.P.R. 32, 36 (1915), sostuvimos lo siguiente:

> **El albacea no es el administrador de la herencia pues a menos que el testador le haya conferido ese carácter, no tiene otras facultades que las determinadas en los artículos 876 y 877 del Código Civil;** pero aun en los casos en que sea tal administrador por voluntad del testador o por nombramiento de los herederos o del tribunal, aun así no está autorizado para enajenar bienes inmuebles o derechos reales porque este derecho no es inherente a la facultad de administrar. (Énfasis nuestro.)

En *Aponte & Sobrino v. Sucn. Pérez*, 48 D.P.R. 449, 454 (1935) indicamos:

> El albacea de que habla nuestro derecho civil no está colocado en las mismas condiciones que generalmente prevalecen dentro del sistema legal americano. Aquí como allá el albacea deriva su autoridad de la voluntad del testador, del testamento que lo nombre; pero entre nosotros cuando el testador no determina especialmente sus facultades, **éstas están limitadas por el artículo 824 del Código Civil . . . . `[M]as ni le compete administrar en absoluto, ni pagar deudas, ni satisfacer más legados que los que consistan en metálico, ni practicar las operaciones particionales . . . .´** (Énfasis nuestro.)

En igual sentido véase, *Sucn. Pelliccia v. Corte,* 36 D.P.R. 654, 656 (1927)("El cargo del albacea, si no se dispone de otro modo en el testamento, **responde solamente a una**

**situación provisional transitoria**, que se presenta desde la muerte del testador y comprende **ciertas medidas que se han de tomar en relación con los bienes**, **entretanto se acepte la herencia por los herederos** y no haya oposición entre ellos por la división del caudal.") (Énfasis nuestro.) Véase además, *Porrata v. Corte*, 53 D.P.R. 148 (1938); *Mercado v. Corte*, 62 D.P.R. 368 (1943).

Vemos así como durante la primera mitad del Siglo XX aplicamos a la figura del albaceazgo la doctrina prevaleciente en España sobre las facultades limitadas del albacea particular.

Ello no obstante, en *Mercado v. Mercado*, 66 D.P.R. 811 (1947) hicimos unas expresiones que arrojan dudas sobre el verdadero alcance de las prerrogativas del albacea particular, en específico, de su facultad para administrar el caudal hereditario. En *Mercado*, nos enfrentamos al conflicto existente entre el Artículo 830 del Código Civil, 31 L.P.R.A. sec. 2527, que dispone que el cargo de albacea es gratuito y, el Artículo 586 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2491, que estipula todo lo contrario. Allí resolvimos que el albacea tiene derecho a recibir la remuneración que dispone el Código de Enjuiciamiento Civil, indicando que éste derogó el Artículo 830 por ser incompatible el uno con el otro y por ser la disposición del Código de Enjuiciamiento Civil sobre el pago al albacea, posterior al Artículo 830.

Justificamos nuestra determinación bajo el fundamento que el Código de Enjuiciamiento Civil "ha ampliado

considerablemente los deberes del albacea . . . ha aumentado sus responsabilidades en tal forma que sería injusto el privarle de compensación." *Mercado, ante*, pág. 814. En apoyo a dicha conclusión, se indicó:

> El albacea, de acuerdo con el Código de Enjuiciamiento Civil, no es un mero custodio de la herencia. El art. 593, por ejemplo, le impone la obligación de pagar las deudas legítimas del finado con intervención de los herederos, o en su defecto, de la corte de distrito. El 587 le impone el deber de recibir las cantidades pertenecientes al caudal y le exige la presentación de cuentas trimestrales de las cantidades recibidas y desembolsadas por él. El art. 588 prescribe que el albacea, cuando haya terminado la liquidación de los bienes, o cuando por cualquier causa cesare en el desempeño de su cargo, deberá presentar a la corte una cuenta final jurada acompañada de los recibos y resguardo correspondiente. Finalmente, el art. 590 dispone que la corte de distrito dictara auto definitivo aprobando la cuenta o haciendo modificaciones. ¿Puede negarse que estas funciones del albacea no constituyen actos de administración?

*Mercado, ante*, pág. 815. *Mercado* ha sido interpretado por algunos sectores en la doctrina como que amplía las facultades legales del albacea particular para incluir también la facultad de administrar los bienes del finado. Véase, González Tejera, o*p. cit.*, págs. 544-46; Vélez Torres, *op. cit.*, pág. 354; Martínez Moya, El Derecho Sucesorio, 67 *Rev. Jur. U.P.R.* 1, 73 (1998).

Curiosamente sin embargo, en la jurisprudencia posterior a *Mercado* --y de mayor actualidad—- al referirnos a las facultades del albacea particular hemos obviado la discusión y análisis de *Mercado* sobre las "amplias facultades" del albacea, y nos hemos limitado a invocar las facultades que se conceden en el Artículo 824 del Código Civil. Nuestra más

reciente jurisprudencia centra su atención en lo que Albaladejo llamó las facultades "secundarias o instrumentales" **inherentes a las legales**, y que asisten al albacea particular en el cumplimiento de su obligación legal. Albaladejo, *op. cit.*, pág. 247. Así pues en *Ab Intestato Marini Pabón*, 107 D.P.R. 433, 438 (1978) indicamos:

> [E]l albacea tiene aquellas facultades que podrían llamarse secundarias o instrumentales, que sean necesarias para el ejercicio de las otorgadas por el testador o para su normal utilización, entre las que se encuentran: la de vigilar sobre la efectividad de las facultades que el testador le concedió en el testimonio y sostener siendo justo, la validez del deseo del testador en juicio y fuera de él, a los fines de que pueda llevar a cabo su cometido y la facultad adicional de tomar las precauciones necesarias para la conservación y custodia de los bienes con intervención de los herederos presentes, hasta el momento que la herencia del causante sea entregada al fiduciario.

Por otro lado, en *Ex parte González Muñiz*, 128 D.P.R. 565, 571 (1991), al referirnos a la facultad legal del albacea de tomar las precauciones necesarias para la conservación y custodia de los bienes que dispone el Artículo 824 del Código Civil, dijimos que éstas son las "medidas provisionales para evitar la pérdida o deterioro de aquéllos [los bienes], **sin que, en absoluto, quede facultado para posesionarse de los mismos** ni para administrarlos, salvo en cuanto las precauciones de que se trate impliquen o consistan precisamente en la tenencia o administración en cuestión. . . Una cosa sí es clara: posesionarse o utilizar los bienes del caudal, sin la autorización del tutelar, es una **extralimitación** en el ejercicio de su función, **incompatible con la naturaleza fiduciaria del albaceazgo.**" (Énfasis en el

original.)  Véase además, *Pino Dev. Corp. v. Registrador*, 133 D.P.R. 373, 390 (1993); *Paine v. Srio. De Hacienda*, 85 D.P.R. 817 (1962).

Estas expresiones son perfectamente compatibles con la figura tradicional del albacea particular y la doctrina vigente sobre este tema.  No suponen una anuencia nuestra hacia la ampliación de las atribuciones del albacea particular.  **Adviértase, que la referencia a las "facultades secundarias o instrumentales" se ha hecho en el contexto de las atribuciones enumeradas en el Artículo 824 del Código Civil, y no como una facultad adicional a éstas.**  Es en ese contexto que la frase debe ser entendida.

Si algo ponen de manifiesto estos casos, es nuestra renuencia a expandir o construir sobre las expresiones en *Mercado*.  Más que nada, lo que hemos hecho --a mi juicio con gran acierto–- es reafirmar la doctrina vigente sobre las facultades que concurren en la figura del albacea particular.

IV

A

Retomemos el tema de *Mercado* para auscultar detenidamente nuestras expresiones y el alcance de las mismas.  Ello a su vez tiene que ir de la mano con un análisis de las disposiciones de la Ley de Procedimientos Especiales, codificada en el Código de Enjuiciamiento Civil, y su interrelación con las disposiciones del Código Civil. Sólo de esa forma, estimo, podemos contextualizar a *Mercado*. Veamos.

Las expresiones contenidas en *Mercado* sobre cómo el Código de Enjuiciamiento Civil ha ampliado las facultades legales del albacea para incluir la administración de los bienes del caudal, son claramente innecesarias para resolver la controversia planteada en el caso. Como indicamos anteriormente, en *Mercado* la controversia giró en torno a si el albacea particular podía cobrar por su gestión conforme dispone el Artículo 586 del Código de Enjuiciamiento Civil; o, si por el contrario, aplicaba la prohibición del Artículo 830 del Código Civil. La aplicación de normas básicas de interpretación estatutaria proveen una fácil solución a esta controversia. Habiendo sido aprobado el Artículo 586 del Código de Enjuiciamiento Civil con posterioridad al Artículo 830 del Código Civil, y siendo ambas disposiciones incompatibles entre sí, debe prevalecer la última expresión de la voluntad del legislador; es decir, prevalece el Artículo 586. *Secretario de Hacienda v. TLD*, res. 17 de marzo de 2005, 163 D.P.R. ___, 2005 TSPR 32; *Autoridad de Puertos v. Municipio de San Juan*, 123 D.P.R. 496 (1989); *Pérez Vega v. Tribunal Superior*, 93 D.P.R. 749 (1966).

Por lo tanto, la conclusión en *Mercado* que la aprobación del Artículo 586 tuvo el efecto de derogar el Artículo 830, es la correcta.[36] En vista de ello, las expresiones sobre la

---

[36] En todo caso, la doctrina española ya había atemperado el rigor de esta disposición en el Código Civil español, Artículo 908, reconociendo que procedía el recobro de los gastos incurridos por el albacea, así como también el pago de honorarios por el desempeño de parte de éste, de gestiones propias a su profesión. M. Albaladejo, *Comentarios al Código Civil y Compilaciones Forales*, Ed. Rev. D. P., Madrid,

**(Continúa . . .)**

ampliación de los poderes del albacea en el Código de Enjuiciamiento Civil son innecesarias y carecen de valor de precedente. *Mercado* sólo resuelve que el albacea puede ser remunerado por su gestión.[37]

Más importante aun sin embargo, *Mercado* pone de manifiesto por primera vez, los problemas e incongruencias existentes entre las disposiciones del Código Civil relacionadas con el albaceazgo y las del Código de Enjuiciamiento Civil, donde se establecen las reglas procesales respecto la administración de los bienes del finado.

Precisamente, sobre la Ley de Enjuiciamiento Civil española de 1886 --precursora de la nuestra--, Royo Martínez apunta con gran atino lo siguiente:

> Nuestro sistema jurídico adolece, sin embargo, pese a la importancia del problema, de una caótica, fragmentaria y deshilvanada regulación del mismo. La ley de Enjuiciamiento Civil es, por inexplicable paradoja, anterior al Código y no revisada para amoldarla a éste, **con lo que ambos cuerpos legales, lejos de completarse ofrecen un mal casado complejo normativo plagado de lagunas, cuando no de contradicciones y antinomias,** que el Tribunal Supremo ha intentado remendar a duras penas, sin conseguirlo más que en parte. (Énfasis nuestro.)

---

España, 1990, Tomo XII, Vol. 2, págs. 321-368; F. Marín Castán, *op. cit*, págs. 171-72.

[37] En *Rivera Torres v. Tribunal Superior*, 126 D.P.R. 692 (1990), al igual que en *Mercado v. Mercado,* 66 D.P.R. 811 (1947) discutimos el Artículo 586 del Código de Enjuiciamiento Civil. En este caso, la controversia giró en torno a la cuantía que debía recibir **el administrador judicial** de la herencia por su gestión. Con el único propósito de justificar la remuneración que se concedía, igualamos la facultad de administrar del albacea con la del administrador judicial. No especificamos, sin embargo, si al referirnos al albacea era al particular o al universal. Las expresiones en *Rivera Torres* deben entenderse como referentes al albacea universal.

Royo Martínez, *op. cit.*, pág. 310; Puig Brutau, *op. cit.*, pág. 382. Véase además, *Ex parte Detrés*, 67 D.P.R. 381, 383 (1947).

Esta incongruencia entre los estatutos se hace más patente y gravosa en Puerto Rico. Las disposiciones de la Ley de Enjuiciamiento Civil española de 1886, vigentes en Puerto Rico al cambio de soberanía, fueron enmendadas por el legislador mediante la ley de 9 de marzo de 1905, insertándole al estatuto caracteres propios del Derecho sucesorio angloamericano. Por lo tanto, en el Código de Enjuiciamiento Civil conviven --no necesariamente de forma armoniosa-- conceptos provenientes del ordenamiento procesal español y del californiano, para atender unas figuras propias del Derecho civil. Así pues, la tarea de armonizar dos cuerpos de leyes que en su origen eran contradictorios, fragmentarios y caóticos, se torna con las enmiendas del año 1905 en una tarea ciclópica. Debemos, sin embargo, intentar armonizar ambas leyes. Tarea que se debe acometer consciente de que nuestro Derecho de sucesiones es de estirpe civilista por lo que al interpretar y armonizar una figura ajena a nuestra tradición --naturalmente de difícil acomodo--, siempre se deberá atemperar y amoldar la misma a nuestra tradición y no lo contrario. Veamos.

B

El Código de Enjuiciamiento Civil establece las normas procesales para solicitar la administración judicial de los bienes del causante. Cuando el causante en su testamento no

hubiere dispuesto expresamente sobre la administración de sus bienes, entonces rigen de manera supletoria las disposiciones de la Ley de Procedimientos Legales Especiales del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2241 *et. seq.* Los Artículos 556-567 regulan el procedimiento judicial de nombramiento de un administrador cuando el causante testó pero no dispuso para la administración de sus bienes.

El Código de Enjuiciamiento Civil le reconoce **legitimación activa** para instar la petición de administración el albacea testamentario, el cónyuge, cualquier heredero forzoso, aquella persona que se presente como heredero testamentario, el legatario o cualquier acreedor con título escrito no asegurado. Artículo 556 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2361.[38] Esta sección **solo pretende reconocerle legitimación activa al albacea -- que no la tenía antes de las enmiendas del 1905-- para solicitar la administración judicial del caudal.** Recuérdese que el Código de Enjuiciamiento Civil contiene **el conjunto de normas procesales que viabilizan en los tribunales el procedimiento de administración de los bienes del finado.**

Por el contrario, la Sentencia dictada concluye que la albacea es "para todos los efectos legales" la administradora de los bienes de la causante. Para llegar a tal conclusión

---

[38] Este artículo proviene del Artículo 1038 de la Ley de Enjuiciamiento Civil de España. El artículo español, el cual no incluye en su enumeración al albacea, ha sido interpretado por el Tribunal Supremo en el sentido que no le reconoce legitimación activa al albacea para instar el juicio voluntario de testamentaría. Véase, Sent. 18 enero 1930, Sent. 23 junio 1883. Véase además, M. Fenech, *Doctrina Procesal Civil del Tribunal Supremo*, Ed. Aguilar, Madrid, España, Vol. IV, pág. 6424.

tiene que suponer que el Artículo 556 no es una disposición para autorizar a los allí enumerados a iniciar el proceso de administración judicial, sino que es una disposición sustantiva que le confiere al albacea el derecho a ser nombrado administrador de la herencia una vez instado el procedimiento. Por lo que entonces, expedidas las cartas testamentarias, el albacea queda facultado para administrar los bienes del caudal relicto.

Esta interpretación del Artículo 556 conflige con lo dispuesto en el Artículo 564 del propio Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2369, [39] donde se establece un orden de prelación respecto las personas que pueden ser nombradas administradores del caudal, **entre los cuales no se encuentra el albacea**. Reiteradamente hemos reconocido que el tribunal escogerá al administrador de la herencia de entre las personas enumeradas en el Artículo 564. *Ex parte Ríos,* 67 D.P.R. 418 (1947); *Ex parte Detrés, ante*; *Cividanes v. López Acosta*, 24 D.P.R. 269 (1916); *Sabater v. Escudero*, 23 D.P.R. 854 (1916); *Díaz v. Cividanes*, 23 D.P.R. 847 (1916). Véase además, *Abintestado Balzac Vélez*, 109 D.P.R. 670 (1980); *Rivera v. Corte*, 71 D.P.R. 953 (1950).

---

[39] El Artículo 564 del Código de Enjuiciamiento civil, 32 L.P.R.A. sec. 2369, dispone lo pertinente sobre el nombramiento del administrador judicial:

Podrá nombrar al cónyuge sobreviviente o a la persona con mayor interés en la herencia o sucesión, si tuviere la capacidad necesaria para desempeñar el cargo; y si no la tuviere, o si todos fueren igualmente interesados, o se presentaren objeciones a tal nombramiento, designará el juez un extraño de reconocida honradez y capacidad.

Así, hemos concluido que el cónyuge viudo tiene preferencia para ocupar este cargo y, en su defecto, el heredero con mayor interés. *Martínez v. Martínez*, 26 D.P.R. 156 (1918). La enumeración taxativa del Artículo 564, choca irremediablemente con la Sentencia dictada. Para todos los efectos, y a la luz de los hechos de este caso, la Sentencia dictada tiene el efecto práctico de enmendar el Artículo 564 y revocar *sub silentio*, la jurisprudencia nuestra interpretando ese artículo.

De otra parte, tampoco podemos compartir la conclusión inherente a la Sentencia dictada de que, una vez expedidas las cartas testamentarias el albacea queda investido con la facultad de administrar los bienes del caudal hereditario. El Código de Enjuiciamiento Civil en su Artículo 597, sobre la expedición de cartas testamentarias, **distingue entre cartas testamentarias expedidas a favor del albacea y las cartas de administración expedidas a favor de la persona que el tribunal ha nombrado administrador de la herencia.** La conclusión en este caso hace de la distinción incluida en el artículo una superflua.

Adviértase que el procedimiento de expedición de cartas testamentarias al albacea es uno ***ex parte***, contrario al de administración judicial que requiere **"previa notificación y vista."** *Rivera v. Corte, ante*, pág. 960. (Énfasis nuestro.) El Artículo 559 del Código de Enjuiciamiento Civil dispone que presentada la petición de administración, "procederá el juez a citar al albacea, si lo hubiere, al cónyuge sobreviviente y a los demás herederos y legatarios, así como

a todos los acreedores de la herencia, para que comparezcan en el día, hora y lugar designado . . . ." Por su parte, el Artículo 597[40] dispone que las cartas de administración se otorgarán después que haya concluido este procedimiento judicial designando el administrador.

Como vemos, la Sentencia del Tribunal trastoca significativamente el esquema procesal dispuesto en el Código de Enjuiciamiento Civil para la administración de la herencia. Abonando a lo que Royo Martínez, calificó como el "mal casado complejo normativo plagado . . . de contradicciones y antinomias." Royo Martínez, *op. cit.*, pág. 382.

La interpretación avalada en la Sentencia dictada tiene el claro efecto de circunvalar la última voluntad del testador quién, pudiendo nombrar al albacea administrador de la herencia, optó por no hacerlo y, por el contrario, prefirió conferirle facultades limitadas. Bajo el esquema establecido hoy, a modo de ejemplo, un albacea particular que recibe la encomienda limitada de velar por el cumplimiento de un legado, una vez recibe las cartas testamentarias queda facultado con todos los poderes de administración de una herencia, con las implicaciones que ello tiene para con los herederos y el trastoque que supone para el ordenamiento sucesoral.

---

[40] En lo pertinente, el Artículo 597, 32 L.P.R.A. sec. 2571, *in fine*, dispone lo siguiente:
   "Tan pronto como un administrador haya prestado su fianza y juramento oficial, el juez o tribunal que lo hubiere nombrado expedirá a su favor cartas de administración bajo su sello, en testimonio de su autoridad."

De otra parte, nos parece por lo tanto, que los Artículos 597, 588 y 593 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2511, 2512 y 2541, invocados en *Mercado* como ejemplos de la ampliación de las facultades del albacea particular y que sirven de apoyo a la Sentencia dictada, recogen sólo gestiones con las que debe cumplir el albacea que ha sido nombrado administrador de la herencia por el testador. Es decir le aplican solo al albacea universal no al particular. Este último sólo tiene las facultades que le reconoce el Código Civil.

C

Lo cierto es que la inserción de la figura del albacea en el Artículo 556 es producto de las enmiendas que sufrió el Código de Enjuiciamiento Civil mediante la Ley de 9 de agosto de 1905, cuando se introdujeron a ese cuerpo legal enmiendas procedentes del Código de Enjuiciamiento de California.

En el derecho angloamericano la figura del ejecutor ("executor")[41] es la idónea para iniciar el proceso judicial de administración de bienes toda vez que es la persona nombrada en el testamento para hacerse cargo de los bienes del causante. Es decir, es la persona que administra los

---

[41] El "executor" a pesar de ser nombrado en el testamento, tiene que acudir al tribunal para ser reconocido y aceptado como tal. A estos efectos, el tribunal deberá expedir cartas testamentarias ("letters testamentary") para evidenciar el nombramiento oficial del administrador. *Íbid*, a la pág. 13. De ahí que nuestro Código de Enjuiciamiento Civil ordene en su Artículo 597, 32 L.P.R.A. sec. 2571, la expedición de cartas testamentarias a favor del albacea, las cuales constituirán prueba de su autoridad. Vemos así los paralelos entre la figura del albacea con la del "executor" del Derecho angloamericano.

bienes del causante. J.A. Schoenblum, *Page on Wills*, Tomo 1, Anderson Publishing 2003, págs. 11-13.[42]

No podemos equiparar la autoridad conferida al "executor" con los poderes del albacea de la doctrina civilista. Esto pues, la titularidad de la propiedad personal del causante así como la facultad de vender, hipotecar o arrendar la propiedad inmueble, de ser necesario para pagar las deudas, recae sobre la administración del "executor". *Íbid*, a la pág. 14. Contrario a nuestro derecho sucesorio, en el cual la titularidad de los bienes nunca pasa al albacea y los amplios poderes para administrar deben ser conferidos expresamente por el testador o por el tribunal.

Toda vez que las figuras del albacea y del "ejecutor" proceden de tradiciones jurídicas distintas; que se asientan sobre teorías antagónicas sobre el Derecho sucesivo, hay que procurar interpretación que sea más armoniosa y respetuosa de nuestra tradición jurídica civilista. Todo ello nos lleva a concluir que el albacea particular no tiene facultades de administración y solo aquellas enumeradas en el Código Civil. Asimismo, el Artículo 556 del Código de Enjuiciamiento Civil se limita exclusivamente a reconocerle al albacea legitimación activa para solicitar del Tribunal que nombre un administrador de la herencia.

---

[42] Cuando el testador no identifique persona alguna a estos efectos, el tribunal asignará un administrador ("administrator") y expedirá cartas de administración. J.A. Schoenblum, *Page on Wills*, Tomo 1, Anderson Publishing 2003, pág. 13. Por su parte, como vimos, el Artículo 597 del Código de Enjuiciamiento Civil nuestro provee similarmente para la expedición de cartas de administración tan pronto el administrador haya prestado fianza y juramento oficial. 32 L.P.R.A. sec. 2571.

Para resumir, a base de lo anterior soy del criterio que, primero, el albacea particular no tiene la facultad de administrar los bienes del caudal hereditario del causante. Cuando el testador ha dispuesto que el albacea tendrá los poderes y facultades que la ley concede, se refiere a los poderes enumerados en el Artículo 824 del Código Civil y aquellos que sean "precisos y necesarios" para descargar los primeros. Segundo, los Artículos 587, 588 y 593 del Código de Enjuiciamiento Civil enumeran algunas de las responsabilidades que tiene que cumplir el albacea que ha sido nombrado administrador de la herencia por el testador; es decir, el albacea universal. No son disposiciones que enmiendan el Artículo 824 del Código Civil. Tercero, el Artículo 556 del Código de Enjuiciamiento Civil es sólo una norma de carácter procesal que le reconoce legitimación activa al albacea para solicitar la administración judicial del caudal. No es por lo tanto, una norma sustantiva que le confiere el derecho a ser nombrado por el tribunal para administrar los bienes del difunto. Cuarto, la expedición de cartas testamentarias al albacea es un procedimiento *ex parte* mediante el cual se expide el referido documento como prueba de la autoridad de éste. La carta testamentaria no es una autorización para que el albacea actúe como administrador de la herencia.

V

Al aplicar estas conclusiones a la controversia ante nuestra consideración, entiendo que la determinación del Tribunal de Primera Instancia sobre el alcance de las

facultades del albacea particular fue correcta. No hay duda que, conforme los términos del testamento otorgado por la licenciada Urraca, la albacea en este caso recibió una designación de albacea particular. Los términos del testamento en cuanto a esto son claros. Como tal, la albacea sólo podía desempeñar las facultades conferidas en ley entre las cuales no se encontraba la de administrar los bienes de la herencia. Ciertamente, la albacea en este caso en el descargo de su función como tal, llevó a cabo un sinnúmero de gestiones que sólo pueden catalogarse como actos de administración. Específicamente en lo que se refiere a los fondos depositados en el Banco Popular. No hay controversia tampoco que estas gestiones se efectuaron sin la autorización previa de la heredera, aunque si hay que consignar que ésta fue informada inmediatamente después que las mismas se llevaron a cabo. A base de lo anterior, sostengo que el Tribunal de Primera Instancia actuó correctamente al enfrentarse a esta controversia y disponer de la misma en la forma que lo hizo. Es por ello que entiendo debió confirmarse al foro primario.

Finalmente, sobre el contrato de servicios profesionales suscrito por la albacea y el licenciado Rey, somos del criterio que el caso debe devolverse al foro *a quo* para que se celebre una vista y se determine si la albacea prestó su anuencia al mismo. Nos explicamos.

Surge de la transcripción de la vista de protocolización del testamento, que la heredera y su representante legal tenían conocimiento que el licenciado Rey había llegado a un

acuerdo de servicios profesionales con la albacea. Mediante este acuerdo, el licenciado Rey habría de llevar a cabo gestiones a nombre de ésta "durante la tramitación de todo el albaceazgo." De la transcripción se desprende que el licenciado Rey le indicó al tribunal lo siguiente respecto a sus servicios profesionales: "El compañero [el abogado de la heredera] me ha pedido un estimado de no solamente del costo de protocolizar el testamento sino del costo de los servicios que voy a prestar a la albacea, como albacea, durante la tramitación de todo el albaceazgo. Así que no va haber ningún problema. El compañero y yo discutiremos la situación posteriormente."

No surge del expediente sin embargo, si esa información se ofreció y si la heredera accedió a los honorarios y consiguientemente a los trabajos objeto del contrato. Si ello fuera así, muy bien pudiera concluirse que la heredera prestó su anuencia al contrato ratificando el mismo, por lo que no procedía que se decretara la nulidad. Habida cuenta de lo anterior, como indiqué, devolvería el caso al foro de instancia para la celebración de una vista donde se dispusiera de esta controversia.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Dionisia Flecha Quiñones

    Recurrida

    v.                         CC-2003-488       Certiorari

Carmen Elizabeth Lebrón Morges;
José Ángel Rey y otros

    Peticionarios

Opinión Disidente emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 23 de noviembre de 2005.

Por entender que una albacea a quien la testadora no ha dotado de atribuciones específicas no puede exceder de las que le reconoce el Código Civil y que el contrato suscrito por ella con el licenciado José Ángel Rey es nulo, disiento del resultado a que ha llegado este Tribunal. Además entiendo que fue correcta la determinación del tribunal de instancia de descalificar al referido abogado.

I.

En síntesis, los hechos de este caso son los siguientes. La licenciada Ivette Josefina Orraca López falleció sin tener legitimarios y dejando testamento ológrafo. En dicho testamento instituyó

a la señora Dionisia Flecha Quiñones heredera universal. A la señora Carmen Lebrón Morges, de otra parte, le hizo ciertos legados y la nombró albacea "con todas las potestades que concede la ley".

Luego de protocolizar el testamento, la señora Lebrón Morges solicitó que se le expidieran cartas testamentarias. El tribunal de instancia así lo hizo, expresando que facultaba a la albacea, en cuanto no fuera incompatible con la ley o la voluntad de la testadora, a tomar posesión de los bienes de la finada y desempeñar en cuanto a ellos los poderes, facultades y obligaciones que señalaran la ley y el testamento. La señora Lebrón Morges entonces tomó posesión de las cuentas bancarias de la testadora, pagó deudas y transfirió el remanente a otra cuenta. Además, otorgó un contrato con el licenciado José Ángel Rey mediante el cual el último se obligaba a prestarle varios servicios legales conducentes a celebrar los trámites sucesorios necesarios y ayudar a la albacea en la administración del caudal. El licenciado Rey también se comprometía a llevar a cabo las gestiones necesarias para inscribir a nombre de la testadora los bienes heredados de la madre de ésta. A cambio de dichos servicios, el licenciado Rey recibiría un 15% del caudal de la licenciada Orraca López.[43]

---

[43] No obstante, se especificó que el licenciado Rey cobraría por separado, a razón de $150 la hora por otros servicios, como la defensa judicial del testamento en caso de impugnación y la defensa de las facultades o desempeño de la albacea. Además, el licenciado Rey estipuló que lo pactado no incluía tampoco los

**(Continúa . . .)**

Enterada la heredera, la señora Flecha Quiñones, de las actuaciones de la albacea, instó demanda y solicitó que se declarasen nulas las cartas testamentarias por autorizar a esta última a tomar posesión de los bienes. Además, adujo que no era válido el contrato suscrito entre la señora Lebrón Morges y el licenciado Rey, por cuanto la primera no tenía facultad para otorgarlo. Posteriormente, la señora Flecha Quiñones también solicitó la descalificación del licenciado Rey.[44]

El tribunal de instancia resolvió que no era necesario declarar nulas las cartas testamentarias. No obstante, aclaró que ellas no le concedían una facultad de administración a la albacea, cuyas funciones se debían circunscribir a las limitadas que le reconoce el Código Civil de Puerto Rico. Ante la ausencia de poder de administración, el tribunal determinó que la albacea no podía suscribir el contrato con el licenciado Rey. Por último, descalificó al referido abogado. El Tribunal de Apelaciones confirmó la determinación del foro de instancia.

De lo anterior, se desprende que ante nos se presentan tres controversias, dos de ellas íntimamente relacionadas: (1) si una albacea a la que la testadora no

---

honorarios que él debía percibir por servicios prestados a la testadora previo a su fallecimiento.

[44] La señora Flecha Quiñones solicitó la descalificación del licenciado Rey en tres ocasiones. Arguyó, entre otras cosas, que procedía la descalificación porque el abogado tenía un conflicto de intereses.

le ha conferido facultades administrativas puede tenerlas, (2) si una albacea en la circunstancia antes descrita puede otorgar un contrato de servicios profesionales con cargo al caudal, y (3) si procede la descalificación sumaria de un abogado que es acreedor de un caudal y se ha comprometido a representar a éste y a la albacea testamentaria, que aduce tener capacidad administrativa. Veamos.

## II.

## A.

En nuestro ordenamiento, la obligación de velar por el fiel cumplimiento del testamento, así como la administración de los bienes, normalmente están confiadas a los herederos. *Véase*, Francisco Marín Castán, en *Comentario del Código Civil 5 (Arts. 858 al 1.087)*, Ignacio Sierra Gil de la Cuesta, coordinador, Bosch, 2000, pág. 125. Son ellos, como sustitutos del causante, los que deberán asegurarse de que la última voluntad del testador se cumpla. Además, como son los herederos los que responderán por el pago de las acreencias del caudal y la entrega de los legados, normalmente serán también los encargados de la administración en lo que finalizan todas las operaciones sucesorias.[45]

---

[45] En el Código Civil se regulan varios supuestos en los que la herencia se debe poner bajo administración: cuando la viuda está embarazada, en cuyo caso ella será la preferida para el cargo; cuando uno de los herederos está sujeto a una condición suspensiva, situación en que algún heredero que no esté sujeto a condición deberá asumir la administración; cuando un heredero acepta a beneficio de inventario, lo que dará lugar a veces a que

**(Continúa . . .)**

Ahora bien, en caso de que el testador así lo desee y lo exprese, todas o algunas de esas facultades se pueden otorgar a una o varias personas particulares. Así, pueden coexistir junto con los herederos los albaceas y los contadores partidores, cargos que también pueden fundirse en una misma persona. *Véase*, J. Santos Briz *et al*, *Tratado de Derecho Civil*, Tomo 6, Bosch, 2003, pág. 380. El asunto se reduce a uno de voluntad testamentaria: qué facultades quería conceder el testador, a quiénes y cómo las quería repartir entre ellos.

En cuanto al albacea, cabe decir que es una persona a la que, en virtud de un testamento, se le ha encomendado una misión para cuya consecución se le han otorgado ciertas atribuciones. *Véanse*, Miguel Royo Martínez, *Derecho Sucesorio "mortis causa"*, Edelce, 1951, pág. 315; Manuel Albaladejo, *Curso de Derecho Civil V*, Bosch, 1982, pág. 359. El contenido de esa misión o encargo será especificado por el testador, quien también expresará las facultades que deba tener el albacea para llevar a cabo su tarea. *Véase,* Art. 823 del Código Civil, 31 LPRA sec. 2520.

A modo supletorio, cuando el testador nombra un albacea y no designa sus facultades o bien expresa que tendrá las de ley, se acude al Código Civil para conocer cuáles serán. En esos casos, aplica el Art. 824, 31 LPRA

---

él mismo se convierta en administrador. *Véanse* los artículos 920, 730-731, 980 del Código Civil, 31 LPRA sec. 2717, 2342-2343, 2817.

sec. 2521, que le reconoce a los albaceas a los que el testador no les haya hecho asignación específica las siguientes atribuciones: (1) disponer y pagar los sufragios y el funeral del testador, según se disponga en el testamento o de acuerdo a las costumbres del pueblo, (2) satisfacer los legados en metálico, con el beneplácito de los herederos, (3) vigilar por la ejecución del testamento y sostener, si es justo, su validez, y (4) tomar las precauciones necesarias para la conservación y custodia de los bienes, pero con intervención de los herederos presentes. La doctrina española está conteste en que en ausencia de una disposición testamentaria que particularice las facultades del albacea, este artículo [idéntico al 902 español] rige sus poderes y deberes. Véanse, *José María Manresa y Navarro, Comentarios al Código Civil Español*, Tomo VI, Vol. II, Reus, 1973, pág. 972, Albaladejo, *op cit.*, págs. 357-58, Royo Martínez *op cit.* pág. 320, Marín Castán, *op cit.*, pág. 156.

### B.

La norma sobre las funciones limitadas del albaceazgo —cuando el testador no había dispuesto otra cosa— no confrontó problema alguno durante casi la mitad del siglo pasado.[46] En 1947, sin embargo, en el contexto de un litigio que había ocasionado múltiples

---

[46] *Véanse*, por ejemplo, Sucesores de L. Villamil v. El Registrador, 16 DPR 759 (1910), Crehore v. El Registrador, 22 DPR 32 (1915), Sucesión Pelliccia v. Corte, 36 DPR 654 (1927), Aponte v. Sucesión Pérez, 48 DPR 449 (1935).

pronunciamientos de este foro, hicimos ciertas expresiones innecesarias que se apartaron de la norma.

Así, en Mercado v. Mercado, 66 DPR 811 (1947), nos cuestionamos si el albaceazgo era cargo gratuito o remunerado. En ese caso estábamos ante un albacea al que el testador no le había conferido facultades especiales. No obstante, ese albacea, que era también heredero, estaba en posesión de los bienes y el tribunal le había ordenado que llevara a cabo un inventario de éstos. *Véase*, Porrata v. Corte, 53 DPR 148 (1938). Además, como parte de un contrato de transacción, los otros coherederos le habían asignado unos deberes adicionales, incluidos algunos que deben calificarse propiamente como de administración. *Véase*, Mercado v. Corte, 62 DPR 368 (1943).

Al dilucidar en Mercado v. Mercado, *supra*, si procedía pagarle a ese albacea por sus labores, nos encontramos con un conflicto insalvable entre el Código Civil y el Código de Enjuiciamiento Civil. El primero dispone que el albaceazgo es un cargo gratuito cuando el testador no le ha señalado compensación, mientras que el segundo regula un esquema de compensación para los albaceas y administradores. Art. 830 del Código Civil y Art. 586 del Código de Enjuiciamiento Civil. 31 LPRA sec. 2527 y 32 LPRA sec. 2491. Resolvimos que el cargo debía remunerarse y explicamos que ante el conflicto directo entre los dos cuerpos legales, debía seguirse lo

dispuesto en la ley más reciente, o sea el Código de Enjuiciamiento Civil.

Dicho resultado no ofrece mayores problemas. Tanto el caso de Porrata v. Corte, *supra*, como el de Mercado v. Corte, *supra*, revelan que a pesar de que el testador no le había conferido poderes especiales al albacea, los coherederos y el tribunal de instancia -en procedimientos en los que participaron todas las partes interesadas- le encomendaron deberes que superaban, por mucho, los enumerados en el Art. 824 del Código Civil. Ante el tiempo y trabajo que había dedicado a dichas obligaciones, en Mercado v. Mercado, *supra*, correctamente determinamos que se le debía remunerar al albacea por su labor.

No obstante la corrección del resultado, Mercado v. Mercado, *supra*, resultó innecesariamente problemático ya que allí hicimos ciertas expresiones desafortunadas. En particular, añadimos que el Código de Enjuiciamiento Civil había expandido los deberes y responsabilidades del albacea.

Esas expresiones, más que resolver una tensión latente entre el Código de Enjuiciamiento Civil y el Código Civil en lo que respecta al albaceazgo, complicaron esta área del derecho. Luego de Mercado v. Mercado, *supra*, nuestra jurisprudencia demostró una notable ambivalencia hacia la idea de que el Código de Enjuiciamiento Civil había ampliado las facultades que puede tener un albacea al que el testador no ha dotado de

mayores poderes y deberes que los que menciona el Art. 824. En ocasiones, como en <u>Paine v. Secretario</u>, 85 DPR 817 (1962), al referirnos a un albacea hacíamos alusión a su poder de administración. Otras veces, sin embargo, exponíamos la normativa sobre el albaceazgo con referencia a lo dispuesto en el Código Civil, particularmente en el Art. 824. *Véase*, <u>González Muñiz, Ex Parte</u>, 128 DPR 565 (1991).

C.

El caso de autos nos brinda la oportunidad de determinar si, al amparo de lo expresado en <u>Mercado v. Mercado</u>, *supra*, una albacea a la que la testadora no le otorgó facultades específicas puede, a pesar de ello, fungir como administradora del caudal. La Sentencia emitida por este Tribunal contesta esa pregunta en la afirmativa. El albacea en esa circunstancia sólo tiene que dirigirle una petición ex parte al tribunal de instancia a esos efectos para que dicho foro venga obligado a concederle la administración. Apoya dicha solución en el Art. 556 del Código de Enjuiciamiento Civil, 32 LPRA sec. 2361. No estamos de acuerdo. Dicha disposición tiene un alcance diferente al que se le pretende dar mediante la Sentencia.

Estamos esencialmente de acuerdo con las secciones II, III y IV de la Opinión de Conformidad, Concurrente y Disidente de la Jueza Asociada señora Rodríguez Rodríguez en que el Art. 556 del Código de Enjuiciamiento Civil le reconoce legitimación a un albacea para solicitar al

tribunal de instancia que decrete la administración judicial de los bienes del caudal. Sin embargo, no puede concluirse a base de ese artículo que la administración judicial de los bienes del finado tenga que ordenarse siempre que un albacea así lo pide. Todo lo contrario, el propio texto del artículo indica que quien solicita la administración deberá justificar su pedido. El que un albacea, u otra persona legitimada para ello, solicite la administración judicial de los bienes del caudal no puede conducir automáticamente a una orden del tribunal a esos efectos. Previo a nombrar un administrador, el tribunal deberá llevar a cabo una vista a la que haya citado a las partes con interés para que éstas puedan tener oportunidad de expresarse. *Véase*, Art. 564 Código de Enjuiciamiento Civil, 32 LPRA sec. 2369.

De lo anterior se desprende que el Código de Enjuiciamiento Civil no puede servir de atrecho para obtener por vía judicial aquello que no se consiguió mediante el testamento. En este caso particular el testamento no confirió facultades administrativas a la albacea, ni tampoco lo hizo el tribunal de instancia. Ese foro meramente expidió cartas en que se reconocía que la señora Lebrón Morges era albacea y se le facultaba para ejercer los poderes que, en virtud del testamento y la ley, ya tenía. No podemos, por lo tanto, aceptar la teoría de la señora Lebrón Morges de que podía llevar a cabo actos de administración de la herencia, a pesar que el testamento no la había facultado para ello, porque el

Código de Enjuiciamiento Civil le permite realizar tales acciones.

Nótese que no estamos ante un caso donde haya un conflicto directo entre el Código Civil y el Código de Enjuiciamiento Civil. El primero indica cuáles son las facultades de un albacea cuando el testador, a pesar de haberlo nombrado, ha obviado otorgárselas específicamente. El Código de Enjuiciamiento Civil, de otra parte, regula el procedimiento para que se nombre un administrador judicial en los casos en que sea necesario, Art. 558, 32 LPRA sec. 2363, o cuando a base de los hechos se justifique dicha administración, Art. 556, 32 LPRA sec. 2361.

Ni el uno ni el otro varían la norma general de que en ausencia de voluntad testamentaria en contrario, serán los herederos los encargados de la administración. Tampoco están en conflicto entre sí por cuanto uno se refiere a las facultades del albacea y el otro al procedimiento para nombrar un administrador judicial. Además, las expresiones en el Código de Enjuiciamiento Civil que aluden al albacea y parecerían implicar facultades adicionales deben interpretarse, según expuso la Jueza Asociada señora Rodríguez Rodríguez, como que se refieren a los que, en virtud de la voluntad testamentaria, son albaceas universales.[47] Recuérdese que

---

[47] Albaceas universales son aquellos a los que se les ha confiado la misión de encargarse del cumplimiento global del conjunto de la ordenación sucesoria que estableció el testador, aún cuando se le hubiesen

**(Continúa . . .)**

"[l]a regla de hermenéutica más confiable es aquélla que permite armonizar las contrariedades entre dos estatutos para fijar el verdadero alcance de cada uno". Andino v. Andino, 83 DPR 138, 141 (1961).[48]

Por último, Mercado v. Mercado, *supra*, tampoco sirve de apoyo para la contención de la albacea. La norma de ese caso se circunscribe a que el albaceazgo es un cargo remunerado. Lo que añadimos sobre la expansión de las facultades de los albaceas, aunque se entiende a la luz de los hechos muy particulares de ese caso, no deja de ser un *dictum* y no le concede un derecho a la señora Lebrón Morges a administrar el caudal.

A la luz de lo anterior, cuando un testador nombra a un albacea y dispone que tendrá las facultades que concede la ley, el albacea debe limitarse a ejercer aquéllas enumeradas en el Código Civil.

---

suprimido facultades específicas. La tarea de este tipo de albacea es dejar ultimada la sucesión. De otra parte, los albaceas particulares son los que tienen una o varias atribuciones concretas. Se entienden particulares los albaceas a los que el testador nombró sin señalarles facultades específicas, por cuanto éstos tienen las enumeradas en el Código. *Véase,* Albaladejo, *op cit.* págs. 350-351.

[48] Ese caso también lidiaba con el albaceazgo, en particular con la forma de aceptarlo. Para poder dar vida a la regla de hermenéutica recién citada, tuvimos que distinguir a Mercado v. Mercado, *supra*, explicando que en cuanto a la aceptación del cargo se refiere, no hay incompatibilidad entre el Código de Enjuiciamiento Civil y el Código Civil. Por lo tanto, no era necesario dejar sin efecto las disposiciones de ninguno de esos cuerpos.

III.

En vista de que entendemos que la albacea no poseía las amplias facultades que pretendía tener, es forzoso concluir que no podía suscribir el contrato de servicios legales con el licenciado Rey.  El asunto queda atendido por los Arts. 1209 y 1211 del Código Civil, 31 LPRA 3374, 3376, que en lo pertinente rezan:

> Art. 1209
>
> Los contratos sólo producen efecto entre las partes que los otorgan y sus herederos [...]
>
> Art. 1211
>
> Ninguno puede contratar a nombre de otro sin estar por éste autorizado o sin que tenga por ley su representación legal.
>
> El contrato celebrado a nombre de otro por quien no tenga su autorización o representación legal será nulo, a no ser que lo ratifique la persona a cuyo nombre se otorgue antes de ser revocado por la otra parte contratante.

En el caso de autos, la albacea Lebrón Morges y el licenciado Rey otorgaron un contrato mediante el cual el último quedaba obligado a prestar servicios legales a cambio de una compensación que se pagaría del caudal. Como la única heredera de la testadora no compareció, debe concluirse que la señora Lebrón Morges actuó a nombre de ésta.  No obstante, la albacea no estaba autorizada por la heredera para suscribir el referido contrato.  Tampoco se trata de un supuesto en que la ley permite la representación por cuanto, como hemos visto,

las facultades de un albacea en la posición de la señora Lebrón Morges son limitadas y no incluyen la de otorgar un contrato para proveer servicios legales en beneficio de la administración del caudal. Por último, tampoco estamos ante un supuesto en que la heredera hubiese ratificado el contrato. Por el contrario, surge del expediente que tras ser notificada de la existencia y términos del referido contrato, la heredera Flecha Quiñones presentó demanda solicitando se declarase nulo el pacto.

IV.

Nos resta por examinar un último planteamiento: si el tribunal de instancia actuó correctamente al descalificar al licenciado Rey. Dicho abogado ha presentado una factura al caudal por $23,766, por concepto de una deuda que tenía la testadora. Es, por tanto, el acreedor principal del caudal.[49] No obstante, suscribió un contrato mediante el cual se comprometía a representar a una persona que alegaba tener poderes de administración y que se había arrogado la facultad de pagar las deudas del caudal.

El tribunal de instancia descalificó al licenciado Rey. Expuso el referido foro que la descalificación procedía en vista de que el abogado tenía un conflicto de intereses, y para evitar la apariencia de conducta

---

[49] Según la "Relación de Deudas de la Causante" la albacea entiende que hay que satisfacer unos $44,607 a los diversos acreedores de la testadora. De ellos, el que tiene la acreencia mayor es el licenciado Rey, seguido por un préstamo de casi $8,000.

impropia.  Al confirmar el Tribunal de Apelaciones esa determinación, recalcó el hecho de que el licenciado Rey es acreedor del caudal.

En In re Toro Cubergé, 140 DPR 523, 529 (1996), explicamos que mediante el Canon 21 del Código de Ética Profesional, 4 LPRA Ap. IX C.21, se procura evitar que un abogado represente intereses encontrados.  Añadimos que una de las situaciones en que ello puede ocurrir es cuando el abogado tiene intereses personales que puedan afectar su juicio profesional.  "La situación que debe evitarse es aquella en la cual el deber de lealtad completa que tiene el abogado para con su cliente puede ser incompatible con algún interés propio que el abogado también quiera promover o defender." *Id*, pág. 530.

A la luz de los hechos de este caso, entiendo que no procede la revocación de los foros recurridos.  Cuando el tribunal de instancia descalificó al licenciado Rey tenía ante sí una relación de deudas de la albacea en la que se identificaba al licenciado Rey como acreedor del caudal por $23,000.  Junto con esa relación, había una factura del abogado expresando las diversas partidas que componían esa acreencia, relativas a servicios alegadamente prestados a la testadora en vida de ésta.[50]

---

[50] El conflicto no nace, pues, de la acreencia que el licenciado Rey pudiera llegar a tener por servicios legítimamente pactados y prestados con posterioridad a la muerte de la testadora. Ello de por sí no constituiría un problema ético.  La circunstancia ante nos es distinta, sin embargo, porque el licenciado Rey ya era acreedor del caudal cuando asumió la representación legal de la albacea.

**(Continúa . . .)**

También obraba en el expediente el contrato entre el licenciado Rey y su clienta, mediante el cuál el primero se comprometía a ayudar a la última en las labores de administración del caudal, "incluyendo el pago de las obligaciones del caudal".[51]

En vista de lo anterior, entiendo que el conflicto de intereses aquí era evidente y que no era necesaria una vista para tomar una determinación al respecto. Distinto a lo ocurrido en Otaño v. Vélez, 141 DPR 820, no estamos ante un conflicto por razón de representación sucesiva adversa. Cuando la moción de descalificación se basa en esa razón, deben considerarse factores que no son relevantes en los casos de conflicto de interés personal, como por ejemplo, si existe una relación sustancial entre una y otra representación.

---

[51] En ese mismo lenguaje se expresa en la carta contrato, en la que el licenciado Rey escribió:

> "Tengo el gusto de confirmarle con esta los términos y condiciones mediante los cuales habré de representarla como abogado en todos los trámites e incidentes relacionados con su desempeño del cargo de albacea de la herencia de la Lcda. Ivette Josefina Orraca López, incluyendo [...] el pago de las obligaciones de la testadora..."

Más adelante, añadió:

> "Finalmente, es preciso aclarar que nada de lo anterior incluye los honorarios que debo percibir por servicios prestados a la Lcda. Orraca y a doña Paquita, en relación con varios asuntos, antes de su fallecimiento. Estos últimos serán objeto de una factura separada que cursaré a usted, como albacea, una vez el Tribunal le haya expedido cartas testamentarias."

Ante estas circunstancias, el tribunal de instancia obró correctamente al descalificar al abogado por conflicto de intereses.

Por los fundamentos antes expuestos, confirmaría en su totalidad la determinación del Tribunal de Apelaciones, que a su vez refrendó las actuaciones del tribunal de instancia. Por estas razones, disentimos de la Sentencia emitida por el Tribunal.


                                    Federico Hernández Denton
                                         Juez Presidente